## BALTIMORE & O. R. CO. et al. v. UNITED STATES.
### No. 305.

District Court, E. D. Virginia.
Dec. 1, 1934.

H. D. Boynton, of New Haven, Conn., Thos. P. Healy, of New York City, M. Carter Hall and E. Randolph Williams, both of Richmond, Va., T. H. Willcox, of Norfolk, Va., Joseph F. Eshelman, of Philadelphia, Pa., and Elmer L. Beach, of Richmond, Va., for petitioners and intervening petitioners.

Elmer B. Collins, Sp. Asst. to Atty. Gen., for the United States.

D. W. Knowlton and E. M. Reidy, both of Washington, D. C., for Interstate Commerce Commission.

Charles Clark, W. N. McGehee, W. L. Grubbs, and Frank W. Gwathmey, all of Washington, D. C., for southern carriers, intervening defendants.

Before SOPER, Circuit Judge, and WAY and CHESNUT, District Judges.

SOPER, Circuit Judge.

This suit in equity was brought under the provisions of the Act of October 22, 1913, c. 32, 38 Stat. 219 (28 USCA § 41 (28) and §§ 43–46), to enjoin, set aside, and annul certain orders of the Interstate Commerce Commission, in which the Commission prescribed divisions, as between northern and southern carriers, of the through rates on Florida citrus fruit moving by railroad to destinations in official classification territory.[1] An interlocutory injunction was likewise sought, and a court of three judges was organized to hear and determine the controversy, under the further provisions of the act (38 Stat. 220 [28 USCA § 47]). Petitioners here are the Baltimore & Ohio Railroad Company, the Pennsylvania Railroad Company, and the Richmond, Fredericksburg & Potomac Railroad Company, the principal northern lines participating in the Florida citrus traffic, which were defendants in the proceedings before the Commission; and certain other carriers in official territory have intervened as petitioners.[2] The complainants assail the prescribed divi-

[1] Official classification territory embraces, generally speaking, the territory east of the Mississippi river and north of the Ohio and Potomac rivers, including New England, portions of Virginia and West Virginia, and certain destinations in Missouri, Iowa, and Wisconsin.

[2] The Boston & Maine Railroad; the New York Central Railroad Company; Pittsburgh & Lake Erie Railroad Company; the New York, New Haven & Hartford Railroad Company; the Central Railroad Company of New Jersey; Reading Company; Lehigh Valley Railroad Company; the Delaware, Lackawanna & Western Railroad Company; the Dela-

sions as confiscatory and claim that the Commission exceeded its statutory and constitutional powers in certain respects hereinafter more fully described. The Commission has intervened as a defendant in support of its order, as have the principal southern carriers of Florida citrus traffic, complainants before the Commission.[3]

Proceedings Before the Commission.

There were two cases before the Commission. In the first, designated No. 24069, certain southern carriers, most of which are intervening defendants here, complained of divisions which they received on citrus fruit moving from Florida to destinations in the eastern portion of official territory. The complaint was filed November 22, 1930. Carriers in that destination territory, some of which are petitioners and intervening petitioners here, were made defendants, and the Commission was asked to prescribe just, reasonable, and equitable divisions for the future, and to require retroactive adjustment of divisions from the date of the filing of the complaint. This case involved by far the more important portion of the Florida citrus fruit traffic moving to official territory; for the movement to the eastern portion, known as the trunk-line territory and New England,[4] is very heavy, amounting in the shipping period from November 9, 1928, to June 30, 1929, to 29,221 cars, while for the same period only 8,773 cars were shipped to central territory. Divisions on shipments to central territory were not put in issue in the complaint in No. 24069. Defendants to this complaint on April 20, 1931, filed a cross-complaint, likewise alleging that existing divisions of joint rates on Florida citrus fruit were unjust, unreasonable, inequitable, and unduly prejudicial as to

them, and praying for the establishment of just, reasonable, and equitable divisions, to have retroactive effect from the date of the filing of the cross-complaint.

The other case, No. 24160, is a general investigation instituted by the Commission on its own motion, on January 3, 1931, to determine whether present divisions of joint rates on classes and all commodities between points in official territory, including Illinois, and points in southern territory, are unjust, unreasonable, inequitable, or unduly prejudicial as between carriers in the two territories, and, if so, what will be the just, reasonable, and equitable divisions to be received by respondents. The carriers in official territory had filed a petition seeking a review of the divisions of interterritorial class rates and rates made certain percentages of class rates, as between that territory and the south; and on request of the southern carriers, the investigation was made broad enough to include all commodity rates as well. Evidence concerning the divisions on Florida citrus fruit moving to central territory was taken in No. 24160, and considered together with the evidence in No. 24069, so that in effect the issue concerning divisions of rates on citrus fruit from Florida to all of official territory was segregated from the general divisional controversy between northern and southern lines. It was dealt with as a single issue, apart from the general controversy, by the Commission in its successive reports and orders.

History of Florida Citrus Rates and Divisions.

The divisional controversy with respect to Florida citrus fruit had its immediate origin in the decision of the Commission in

---

ware & Hudson Railroad Corporation; Erie Railroad Company; Pere Marquette Railway Company; Charles M. Thompson, trustee of the Chicago & Eastern Illinois Railway Company; and the Chesapeake & Ohio Railway Company.

[3] The Atlantic Coast Line Railroad Company, the receivers of the Seaboard Air Line Railway Company and of the Florida East Coast Railway Company, Ga., Southern & Florida Railway Company, Southern Railway Company, Winston-Salem Southbound Railway Company, Florida, Central & Gulf Railway, Fort Myers Southern Railroad Company, Jacksonville, Gainesville & Gulf Railway, Tampa Southern Railroad Company and Tavares & Gulf Railroad Company. The Louisville & Nashville Railroad Company and the Cincinnati, New Orleans & Texas

Pacific Railway also intervened as defendants and answered.

[4] The subdivisions of official territory are defined in Eastern Class-Rate Investigation, 164 I. C. C. 314, 322, as follows: "Official territory is subdivided into three subterritories, which have been recognized in rate making for many years. These are New England, lying east of the eastern boundary of New York; trunk-line territory, which extends westward from there to a line drawn through Buffalo and Salamanca, N. Y., Warren, Oil City, Pittsburgh, and Washington, Pa., Wheeling, Parkersburg, Charleston and Gauley, W. Va., these cities being usually referred to as the 'western termini' of the trunk-lines; and Central Freight Association territory, referred to herein as central territory, lying west of that line."

Florida R. R. Commissioners v. A. & R. R. R. Co., 144 I. C. C. 603, known as the Florida Case, which established a basis of rates on citrus fruits from Florida to destinations throughout the United States, effective November 9, 1928. Prior to that time, the rates were made up of combinations of proportional rates, known as gathering charges, from point of origin to Jacksonville, Fla., or other northern Florida gateways, plus other proportional rates from those gateways to northern destinations. The old rates were stated in amounts per box, and, at least in the case of the northern lines, were based upon an estimated weight of 80 pounds per box. The rates prescribed in the Florida Case were single-factor rates from point of origin to destination, stated uniformly in cents per 100 pounds, subject to. a minimum weight of 32,400 pounds per car and an estimated weight of 90 pounds per box, which was found to be the actual average weight. The order in the Florida Case resulted in both increases and reductions in individual rates, but the net result, based on traffic which moved during the 1928–1929 season, was an average reduction of 67 cents per ton. To New England there was a small net increase; but there were important reductions in rates to interior points in trunk-line territory, and even greater reductions in rates to central territory. The average reduction in rates to trunk-line territory and New England was 35 cents per ton, while for central territory it was $1.74 per ton. The northern and southern carriers were unable to agree upon a method of apportioning the aggregate reduction, and this litigation ensued.

The prior history of citrus rates and divisions, which is detailed in the Commissioner's first report in this case, was considered of importance both by the Commission and by the parties. When Florida citrus rates were first established about 1890, joint class and commodity rates between the south and New England trunk-line territory, on traffic generally, were arrived at by adding to the amounts fixed by the southern carriers for their service south of the gateways, such as Richmond, Va., certain charges, known as "specifics" because they were stated in specific amounts, established by the northern lines. Joint rates on Florida citrus were computed in this manner, and, as has been pointed out, the specifics were stated in amounts per box based on the third-class specifics and a box of 80 pounds. Prior to 1908, the through rail rates were determined by the southern lines after the northern lines

had advised them what division was acceptable for the haul north of the gateways. From 1892 to 1908 the citrus fruit specifics remained substantially unchanged, except for an increase to Boston, although some changes were made in both the rates and the gathering charges of the southern lines. Rates as well as divisions to port cities were relatively lower than those to interior points, and the northern lines claim to have borne most of the shrinkage. In 1908, in Florida Fruit & Veg. Shippers' Protective Ass'n v. A. C. L. R. Co., 14 I. C. C. 476, Id., 17 I. C. C. 552, and Id., 22 I. C. C. 11, the Commission prescribed reduced proportional rates from Jacksonville and other base points to eastern destinations. Although it was stated in the Commission's report that the excessive rates, which existed especially as to interior points and points north of New York, were mainly due to excessive divisions received by the lines north of Richmond, the carriers north and south agreed to a proportionate absorption of the reduction. The former divisions were used as prorating factors, and the method adopted is termed a revenue prorate. The divisions so arrived at remained unchanged until November 9, 1928, the effective date of the order in the Florida Case, except for modifications reflecting the general increases of 1918 and 1920 and the general reduction of 1922.

The history of rates on citrus fruit from Florida to central territory is substantially similar. These rates are divided on the Ohio river crossings and prior to 1910 were constructed by combination of proportional rates to and from these crossings. The factors north of the Ohio river were the local fourth-class rates, converted into rates per box on the estimated weight of 80 pounds per box. In 1910, in Florida Fruit & Veg. Shippers' Prot. Ass'n v. A. C. L. R. Co., 17 I. C. C. 552, a reduced rate from Jacksonville to Chicago, was prescribed, and the reduction was divided by agreement upon a revenue prorate. Except as affected by the general increases of 1918 and 1920 and the general reduction of 1922, the rates and divisions in force at this time continued until the effective date of the order in the Florida Case.

When the new rates became effective in 1928, the southern roads suggested a reduction of the divisions on a revenue prorate; but the northern roads contended that pending settlement of the general divisional controversy, they should have an equivalent to the former specifics. The New England and

trunk-line roads contended that the former specifics were based on boxes of 80 pounds, and therefore increased the specifics per box by 25 per cent. in converting them into divisional shares stated in cents per 100 pounds. The carriers in central territory demanded an increase of only 11 per cent. in the former specifics, thus in effect conceding that their specifics applied to 90-pound boxes. According to a test covering the shipping season of 1928–1929, the northern lines, as collectors of the freight, retained in this manner an average of 78 cents per ton more than they had received under the former rates and divisions to New England and trunk-line territory. Since the through rates to this territory were reduced 35 cents per ton on the average, there was a loss of revenue to the southern lines of $1.13 per ton, which, it is estimated, increased the revenues of the northern lines, in the three subsequent seasons, by $1,215,510 over those which they would have received under the former divisions; while the revenues of the southern lines were reduced by $1,761,420. Both northern and southern carriers were less dissatisfied with the tentative status of divisions on shipments to central territory, and no retroactive adjustment of these divisions was sought before the Commission in the pending case.

### Contentions Before the Commission.

Before the Commission, as its report shows, Atlantic Coast Line R. Co. v. Arcade & A. R. Corp., 194 I. C. C. 729, 735, 737, the southern carriers advocated, in principle and in the aggregate result, a revenue prorate—that is, a division of the rates under which both northern and southern roads could absorb a proportionate part of the reduction ordered by the Commission in the Florida Case. The divisions of the northern lines under this plan would be higher than the former specifics converted on the basis of an estimated weight of 90 pounds per box, on shipments to New York and Philadelphia, and in some instances to Baltimore and Boston; but substantial reductions as to interior points would result. Indeed, as to New York, Boston, and Philadelphia, the proposed basis was more favorable to the northern lines than a revenue prorate. A similar plan more closely approximating a revenue prorate was offered by the southern lines as to central territory. The Commission said that the plan, except for some discrepancies, seemed "technically sound, properly reflecting differences in length of haul" and "far superior to the basis of divisions which the northern lines have established." 194 I. C. C. 737.

The northern carriers urged that the question of divisions of rates on citrus fruit could not be considered separately from the general controversy over divisions between the northern and southern lines. They therefore made no proposal as to a permanent basis of divisions on citrus, but argued simply that the divisions which they were then receiving should be tentatively approved, pending further consideration in the general investigation. They contended that the divisions which they had been exacting were no more than the old citrus fruit specifics, converted into cents per 100 pounds. They stressed the fact that the northern divisions were not increased at the time of the general increases in rates in official territory of 5 per cent. in 1914 and 15 per cent. in 1917, although increases in the joint interterritorial rates to the extent of these percentages of the existing divisions were authorized. They also argued that when the interterritorial rates between southern and official territories were increased 33.3 per cent. in the general increase of 1920, their divisions should have been increased 40 per cent., corresponding to the percentage of increase in rate within official territory, instead of 33.3 per cent. Comparisons were advanced between the existing divisions and local rates on citrus fruits in the two territories, and the northern lines showed that their divisions represented a much smaller percentage of comparable local class rates for intraterritorial hauls than the corresponding percentage for the southern lines. The northern divisions were shown to be not unduly high by the use of mileage and first-class prorates as tests. And the fact was stressed that under the divisions which they had established, the ton-mile and car-mile earnings of the northern lines were generally less than those of the southern lines, whose haul is much longer, contrary to the usual rule that such earnings vary inversely as the length of the haul. After making certain other comparisons, the northern lines finally questioned the seriousness of the reduction in revenues resulting from the Florida Case, asserting that the reduction was theoretical and not actual, because the carload minimum had been increased from 24,000 pounds to 32,400 pounds by the same decision, enabling the southern lines to handle the shipments in a smaller number of cars. The latter argument was rejected by the Commission, which found that the average number of boxes per

car since the new rates went into effect had been equaled and exceeded in prior years.

Reports and Orders of the Commission.

The Commission discusses the extent and nature of the Florida citrus traffic generally in its first report, Atlantic Coast Line R. Co. v. Arcade & A. R. Corp., 194 I. C. C. 741, 742. From 1929 to 1931, shipments averaged 921,997 tons annually, about 85 per cent. of which amount was destined to official territory. To a great extent it is a concentrated traffic, moving from the citrus belt, a compact producing area about 200 miles south of Jacksonville, mainly to the most populous cities in the north. There are many points of origin in the citrus belt, and only nine of these in the 1928–1929 period originated more than 1,000 cars, aggregating 29 per cent. of the total citrus traffic. The balance of the shipments originated at stations which averaged 148 cars each, and slightly more than 50 per cent. of the total shipment originated on branch lines. To trunk-line territory and New England, the traffic moves principally over the Atlantic Coast Line and Seaboard Air Line to Richmond, Va., the most important gateway, and is carried from that point by the Richmond, Fredericksburg & Potomac to Potomac Yard, and thence north over the Baltimore & Ohio and Pennsylvania. There is a much smaller movement over the Southern Railway to Potomac Yard. The principal deliveries made by northern carriers in the 1928–1929 period were to eight large cities, which absorbed 73 per cent. of the shipments. The average haul to trunk-line territory during that period was 853 miles in the south and 372 miles in the north, equivalent to a movement from Lake Wales to Altoona via Jacksonville and Richmond.

From the operating testimony, the Commission concluded that the transportation of citrus fruit from Florida is more costly than the general run of traffic in the south. There is a wide distribution of production, and the necessity of providing daily service from all origin points, which differ widely in volume of shipment, and which, at various places, are affected by wide fluctuation in volume from day to day on account of weather and market conditions. The cost has also been increased by the substitution of refrigerator cars for ventilated box cars since 1908; by the heavy return on empty cars; by reconsignments and diversions which, to a large extent, interfere with the running of solid through trains of citrus fruit south of the Florida gateways. North of Florida,

the southern lines do not operate solid trains of perishable freight, presumably because the traffic is not of sufficient quantity. Expedited schedules for citrus fruit were inaugurated in 1930 and 1931, which advanced deliveries by twenty-four hours at New York, Philadelphia, and other important points, and this service added to the cost because the increased speed necessitated reduction of engine tonnage ratings, additional yard service at terminals, greater claim hazards, etc. The northern lines have also been affected by the rental and excessive weight of refrigerator cars, reconsignments, diversions, and expedited schedules. In addition, these lines are affected by the cost of detention of other freight traffic, helper service, drawbridge interference, adverse grade conditions, and the difficulties incident to handling a large volume of traffic through the urban districts of Washington, Baltimore, and Philadelphia. Numerous other conditions are also cited, such as grade separation in populous areas, floating at New York and Philadelphia, and rigorous weather conditions in the winter. The Pennsylvania, during the height of the season, receives a large volume of perishable freight at Potomac Yard and operates solid trains to New York, but claims that the economy ordinarily consequent upon large volume is balanced by the necessity for rapid handling. In particular, the northern lines relied upon high terminal costs involved in expensive delivery facilities, which have been provided. For instance, the Pennsylvania, between 1912 and 1930, invested more than twenty-two millions in such facilities in central and trunk line territories, and the Baltimore & Ohio also invested large amounts. These lines estimated that the average partial terminal expense per car was $29.60 at New York, $21.18 at Philadelphia, and $16.05 at Pittsburgh; and these expenses were offset against the expenses borne by the southern lines at originating terminals in Florida, for which the southern lines were allowed a special portion of the through rate, termed the "Florida arbitrary," in the Florida Case.

The operating testimony relating to hauls to central territory was of similar import on both sides, with emphasis on the cost of expedited schedules, diversions, difficult operating conditions, high terminal costs, and heavy expenses to both sets of carriers in the interchange at Cincinnati. Cincinnati is the principal Ohio River gateway, about 73 per cent. of the total traffic moving through that point. The traffic in this territory

moves principally over three lines, which, in the 1928–1929 test period, handled the following amounts of cars: Cleveland, Cincinnati, Chicago & St. Louis Railway, referred to as the Big Four, 2,959; Baltimore & Ohio, 1,693; Pennsylvania, 1,387.

The Commission's conclusions from the evidence of operating costs were in general favorable to the southern lines. It is said in the report (Atlantic Coast Line R. Co. v. Arcade & A. R. Corp., 194 I. C. C. at page 757): "The voluminous evidence descriptive of operating conditions cannot be translated into terms of costs for the purpose of comparing the two groups of roads in this respect. In general, it indicates that citrus fruit, like other perishable traffic, is given a specialized, expedited service which is undoubtedly more expensive than the ordinary run of freight, and that both the eastern and the southern carriers have equipped their plants and operating organizations to this end. The desirability of the traffic has led the carriers to furnish much incidental service to encourage its movement, including extensive reconsignment and elaborate facilities for the marketing of citrus shipments at destination terminals. Reconsignment undoubtedly is a heavier burden on the southern carriers, which are called upon for most of the diversion and make no charge therefor. The eastern carriers to an important extent have reconsignment charges on this traffic. The use of refrigerator cars for this traffic appears to be particularly burdensome to the southern lines, as they are called upon for a much longer empty haul of these cars than the eastern lines, and must keep on hand a larger supply during the shipping season to accommodate a fluctuating demand. The expensive terminals in the eastern cities appear to be an outgrowth of the strong competition for perishable traffic. The Pennsylvania shows that its terminal at Philadelphia cost $7,047,000, as before stated, and the Baltimore & Ohio has a terminal in the same city assessed for tax purposes at $2,936,225. Nor is Florida citrus by any means the only traffic handled at these terminals. For example, the Pennsylvania has a terminal said to have cost $587,000 at Huntington, Pa., which during the 1928–29 test period received but one carload of Florida citrus fruit."

The Commission considered also the statistical evidence offered by both sides. The lower average traffic density of the southern lines, which was claimed by the northern lines to be offset as a cost factor by the greater capital expenditure in the north and greater operating difficulties particularly at terminals, was discussed without any definite conclusion being arrived at. Density of population in the north and in the south was also reviewed in a general way. In response to the effort of both sets of carriers to compare transportation costs by showing of comparative rate levels, the Commission concluded that much of the difference was purely historical, and that no figures were shown which would serve as a satisfactory index to the general rate levels in the two territories, except that the southern rate level was definitely higher, probably by more than 5 per cent. The evidence was said to support the view previously expressed by the Commission that transportation costs are generally higher in the southern than the northern group, but a definite opinion was avoided because of differences in average hauls, and other factors, which would influence the statistical result.

A comparative study for all eastern and all southern lines, based on the period 1921–1930, which showed operating revenues and costs, tentative property values, ton-mile revenues and costs, and return on tentative value of property, with each item segregated as between passenger and freight service, was regarded as chiefly significant for its showing that passenger traffic is less profitable in the south than in official territory. The nearly equal percentage of return for the two groups shown in this study was regarded as less significant than a similar study covering the year 1930 alone and restricted to those lines carrying 400 or more cars of citrus fruit during the 1928–1929 test period. The comparatively lower rates of return for the southern lines which this study showed were said to be close to the average for the years 1929–1931, inclusive, and to be more nearly representative of conditions in recent years than the 1921–1930 study, in which the high rate of return shown for the southern lines was largely influenced by the Florida boom. The financial condition of the southern lines was concluded to be less favorable than that of the northern, even after making allowances for the indicated greater profit from passenger service in the north.

The Commission did not find any appreciable difference in the operating efficiency of the northern and southern lines, and in particular found that the citrus traffic is handled by all carriers with the utmost expedition and care. A factor which it regarded as more persuasive was the great importance of the citrus traffic to the southern

lines and particularly to the three Florida lines. It produced 2.6 per cent. of the total freight revenue in the south during the years 1928–1931, and only 0.36 per cent. of the gross freight revenue in the northern group. The percentages of the Atlantic Coast Line, Seaboard Air Line, and Florida East Coast were 13.6, 9, and 7.5, respectively.

Coming to more general considerations, the Commission rejected the contention of the northern lines that divisions on citrus fruits should not be determined apart from the general controversy over divisions of all interterritorial class and commodity rates. The higher relative costs of citrus traffic were discussed in the language before quoted. And the history of the citrus divisions was given great weight. It was assumed that the divisional bases agreed upon in 1908 and 1910, which continued in effect until November 9, 1928, and were thus in force for 18 and 20 years, produced on the whole fair results in spite of some inconsistencies. It was assumed that an agreement thus voluntarily entered into and continued in force for such a period could not be confiscatory of the property of either group of carriers. The former agreed bases were also employed as a method of comparing the effect of subsequent divisional bases. The Commission took into account the fact that a modification unfavorable to the northern lines was agreed upon in 1920, when the southern lines were accorded the same percentage increase on their divisions as the northern lines, 33⅓ per cent., although rates in the north were increased 40 per cent., and in the south only 25 per cent. But the worse financial condition of the southern lines was held to negative the view that the northern lines were entitled to such a large share of the revenue as they had retained since November 9, 1928. It was pointed out that the moderate reductions in rates prescribed in the Florida Case were based to a large extent upon evidence of improved conditions on the Florida lines, which had arisen since previous rates were established; and that after the decision in that case, the recession in traffic generally had been more declivitous in the south than in the northern region, amounting to a decrease of 38 per cent. in 1931 under 1926, as compared with 31 per cent. for the northern group, while the average decrease on the Florida lines alone was 45 per cent. Production of citrus fruit, on the other hand, continued to increase during the period, and the moderate decreases in rates prescribed in the Florida case were much more than offset by the increased traffic. And this result, in view of the contraction in other classes of traffic, was viewed as greatly enhancing the relative importance of citrus fruit to the southern carriers. It was said, finally, that the southern lines should absorb the revenue reductions prescribed in the Florida Case, because the reduction was determined upon in the light of evidence of improved conditions on the Florida lines. The Commission's ultimate conclusion seems thus to have been that divisions should be prescribed which would in some measure approximate in result the divisions existing prior to 1928, with the further modification that the reduction in rates imposed by the Florida Case should be absorbed by the southern lines.

In its order of July 3, 1933, as well as in the amendatory order of January 8, 1934, the method of determining the divisions was set forth as follows:

"(a) The so-called Florida arbitrary contained in said rates shall first be deducted and added to the division of the southern lines, as defined in the findings in said report, determined as hereinafter specified;

"(b) On shipments other than those over the Southern Railway via Potomac Yard, Virginia, the remainder of the rates after deduction of the Florida arbitrary hereinabove referred to shall be divided on two percentages, one of which shall apply to the transportation north of the gateways named in the findings in said report and the other to the transportation south of said gateways, the percentage of the southern lines as defined in said findings to be based on the scale of southern factors set forth in the appendix to said report for the short-line distance from point of origin to the gateway through which the shipment moves, and the percentage of the northern lines as defined in said findings to be based on the scale of northern factors set forth in said appendix * * *;

"(c) On shipments over the Southern Railway via Potomac Yard percentages applicable on shipments between the same points via Richmond, Virginia, shall be applied except that 3 shall be deducted from the percentage of the northern lines and added to the percentage of the southern lines."

The order was made effective November 1, 1933, and retroactive adjustment of divisions subsequent to the date of the filing of the petition in No. 24069, in accordance with the method prescribed, was ordered in that case. The findings alluded to in the order were findings specifying the gateways and

a general finding that just, reasonable, and equitable divisions of the rates involved would be those determined as above set forth. The scale of northern and southern factors set forth in the appendix to the report, for determining the percents to be received north and south, begins for the south with 161 for a distance of 600 miles and less, and the factors increase by 3s for each additional 20 miles thereafter, up to 800, after which 3 is added for each additional 25 miles. For the north the factors begin with 44, for a distance of 240 miles and less, 46 for 260 miles, 49 for 280 miles, 51 for 300 miles, and 3 is added for each additional 25 miles.

Four members of the Commission dissented, in an opinion by Commissioner Eastman, which took the position that the prescribed divisions were "much too favorable to the southern lines."

The case was later reopened upon the prior record and certain additional statistical data on file with the Commission, in response to a petition for rehearing filed by the northern lines; and on January 8, 1934, the Commission handed down its report on reconsideration, which carefully considered criticisms directed at the first report. In particular, it was pointed out (Atlantic Coast Line R. Co. v. Arcade & A. R. Corp., 198 I. C. C. at pages 381-384) that statistics for years subsequent to those considered in the former report did not shake the Commission's conviction of the greater financial needs of the southern lines. It was said also that the previous decision did not give effect to the divisional agreement of 1908–1910, although notice had been taken of the apportionment of revenues accomplished by the old agreement; and that, so far as it was possible to estimate, the prescribed divisions would afford the northern lines more revenue than they would have received under the old agreement (Atlantic Coast Line R. Co. v. Arcade & A. R. Corp., 198 I. C. C. at page 381). The order of the Commission, dated January 8, 1934, and made effective from May 1, 1934, reiterates the provisions of the prior order except as to a minor change of no materiality here.[5] Three Commissioners dissented from this decision.

The northern lines later filed a second petition for rehearing, in which substantially the same contentions were made as in the pending case, supported by statistical exhibits on the issue of confiscation. On May 14, 1934, the Commission passed a brief order reciting that "upon consideration of the record in the above entitled proceeding and of the second petition for rehearing," the petition was denied.

### Contentions of the Northern Lines in This Court.

In the pending case before the District Court, the charge is made that the prescribed divisions are not sufficient as to particular and typical hauls or in the aggregate to pay the petitioners' costs and expenses chargeable to the transportation of citrus fruit, from the gateways to destinations in official territory, or to permit petitioners to make any profit on the property used in the service; and hence that the reports and orders of the Commission were unlawful and void, as in conflict with section 15(6) of the Interstate Commerce Act (49 USCA § 15 (6), which requires that the Commission, in prescribing divisions, shall, among other things, give due consideration to the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation; and also in conflict with the Fifth Amendment to the Constitution, providing that no person shall be deprived of his property without due process of law.

It is also charged that the orders of the Commission were arbitrary, and in excess of its statutory powers, because the Commission, ignoring elements to which it is directed by section 15 (6) of the act to give due consideration, subordinated all other findings and facts to the single element of financial need.

A further charge is that the orders were unlawful and in excess of the Commission's statutory powers, because the Commission based its conclusions as to the financial needs of the southern lines upon their average rate of return from their total business, notwithstanding that the divisions under consideration related only to a single commodity, to wit, citrus fruit, and that the carriage of this commodity is the most lucrative which the southern lines (A. C. L.) enjoyed; with the result that the divisions prescribed for the southern lines are sufficient to pay their operating expenses chargeable to the transportation of citrus fruit, plus a reasonable allowance for taxes, and

---

[5] This modification extended the prior order by applying the prescribed divisions to shipments via the Virginia gateways over the Chesapeake & Ohio Railway and the Norfolk & Western Railway, to west Virginia points in central territory.

in addition, to provide a sum available for return on investment far in excess of a fair return on the railroad property devoted to that transportation.

Finally, it is pointed out that the order of the Commission as amended requires the parties to case 24069 to adjust divisions in accordance with the method prescribed on all shipments which moved subsequent to November 22, 1930; and that these requirements mean either that the revenue on the shipments be restated in the aggregate, leaving the southern lines to collect such additional sums as the restatement shall show to be due, or that the northern lines shall pay over the additional sums to the southern lines. And it is contended that if the latter is the proper interpretation, the order would deny to the petitioners the right of trial by jury guaranteed by the Seventh Amendment to the Constitution of the United States, and would deprive them of their property without due process of law in violation of the Fifth Amendment to the Constitution of the United States; that this requirement would work great injury upon the northern lines, since they would be obliged to obey the order, under pain of suffering the penalties provided by section 16 of the act (49 USCA § 16); and that it would further injure the northern lines by compelling them to make payments to certain southern lines now in receivership, who would be unable to repay the amounts in full if it should be later judicially held that the Commission's order was invalid.

### The Issue of Confiscation.

■ Emphasis has been placed by the petitioners upon the first of these propositions. It was realized at the outset that to maintain this contention, the burden was on the petitioners to establish confiscation, for it is only when such an issue is raised as to the effect of an order of the Commission that a carrier is entitled to the independent judgment of the court on both the questions of law and the questions of fact involved. United States v. Louis. & Nash. R. Co., 235 U. S. 314, 35 S. Ct. 113, 59 L. Ed. 245; Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 289, 40 S. Ct. 527, 64 L. Ed. 908; United States v. New River Co., 265 U. S. 533, 44 S. Ct. 610, 68 L. Ed. 1165; Assigned Car Cases, 274 U. S. 564, 580, 47 S. Ct. 727, 71 L. Ed. 1204; New England Divisions Case, 261 U. S. 184, 203, 43 S. Ct. 270, 67 L. Ed. 605; St. Louis & O'Fallon Ry. Co. v. United States, 279 U. S. 461, 538, 49 S. Ct. 384, 73 L. Ed. 798. Otherwise the court is bound to accept the findings of fact of the Commission if they are supported by substantial evidence.

■ A question of the admissibility of evidence arose early in the hearing, and may be conveniently disposed of at this point. It was the position of the United States and of the Commission that the court should be limited to the evidence introduced at the hearing before the Commission and that contained in statistical exhibits relating to carriers in New England and trunk-line territory, which had been attached to the second petition for rehearing and offered to the Commission therewith. The court did not accede to this view, but permitted the petitioners to introduce additional evidence bearing on the issue of confiscation in support of the exhibits mentioned, and also to introduce a series of statistical exhibits and explanatory testimony relating to the carriers in central territory. We believe this ruling to be correct and in accord with the practice adopted in Manufacturers' Ry. Co. v. United States, 246 U. S. 457, 488, 490, 38 S. Ct. 383, 62 L. Ed. 831, where the court declined to hold that the Interstate Commerce Act contemplates that review of the Commission's orders shall always be restricted to the record before it where constitutional rights are involved, but said that as far as practicable, all pertinent objections to action proposed by the Commission and the evidence relating thereto should first be submitted to that body. Compare Oregon R. & N. Co. v. Fairchild, 224 U. S. 510, 525-528, 32 S. Ct. 535, 56 L. Ed. 863; Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 442, 445, 50 S. Ct. 220, 74 L. Ed. 524; Louisiana & P. Ry. Co. v. United States (Com. C.) 209 F. 244, 252.

■ The most important part of the evidence in statistical form now before us was placed in the hands of the Commission with the second petition for rehearing; but after consideration thereof, the petition was denied without opinion in a brief order, and it seems certain that a submission to the Commission of all the evidence that we have heard would have been followed by the same result. The additional evidence, so far as it consists of statistical data as to central territory, is entirely similar in scope to that before the Commission as to trunk-line territory, but much weaker from the petitioners' standpoint; and the only further evidence was that of operating and accounting experts in support of the statistical evidence. The issue of confiscation could not be raised until the nature of the Commis-

sion's decision on the matter of divisions was made known; and we do not think that the carriers lost their right to raise the question merely because it was not broached in the first petition for rehearing. In fact, some modification of their original order was made after the first petition for rehearing had been considered. There seems to be no danger in adopting the practice we have followed. It will not avail the carriers anything to attempt a retrial before the courts of the reasonableness of rates or divisions ordered by the Commission, under the guise of a charge of confiscation, for as the court said in Manufacturers' Ry. Co. v. United States, supra, at 490 of 246 U. S., 38 S. Ct. 383, 392: "Certainly, where the Commission, after full hearing, has set aside a given rate on the ground that it is unreasonably high, it should require a clear case to justify a court, upon evidence newly adduced but not in a proper sense newly discovered, in annulling the action of the Commission upon the ground that the same rate is so unreasonably low as to deprive the carrier of its constitutional right of compensation."

The question of confiscation resolves itself into the inquiry whether the share of the rates allotted by the Commission to the petitioning carriers is sufficient to pay the expenses of transportation, and, in addition, a fair return on the money invested in the property devoted to the service. Section 15(6) of the Interstate Commerce Act provides that the Commission, in prescribing divisions, shall give due consideration, amongst other things, to the amount of revenue required by the carriers to pay their respective operating expenses, taxes, and a fair return on their railroad property held for and used in the service of transportation. Beaumont, S. L. & W. R. Co. v. U. S., 282 U. S. 74, 75, 51 S. Ct. 1, 75 L. Ed. 221. Direct proof bearing on this subject would of course consist of evidence of (1) the actual cost of transporting the commodity from the gateways to destination, (2) the value of the property used in the transportation and delivery of the goods, and (3) the revenues accruing from the allotted divisions. Unless such proof or its equivalent is forthcoming, confiscation cannot be shown. The burden of proof is on the complainant who asserts the confiscatory character of the division, Los Angeles Gas, etc., Co. v. Railroad Commission, 289 U. S. 287, 304, 53 S. Ct. 637, 77 L. Ed. 1180, and on such an issue, general statements of costs, such as those based on the average ton-mile basis, should not ordinarily be considered adequate proof

to sustain a finding of confiscation. Missouri Rate Case, 230 U. S. 474, 506, 33 S. Ct. 975, 57 L. Ed. 1571. For instance, in Northern Pacific R. Co. v. Dept. of Public Works, 268 U. S. 39, 43, 51, 45 S. Ct. 412, 69 L. Ed. 837, where the validity of an order of a State Commission fixing rates on carloads of logs was challenged as confiscatory, the Supreme Court condemned the method adopted by a state department, which ascertained the operating costs of such traffic by the use of a composite figure representing the average operating costs per thousand gross ton miles of all freight carried on certain railroad systems. The court said (page 44 of 268 U. S., 45 S. Ct. 412, 413): "In using the above composite figure in the determination of this issue the department necessarily ignored, in the first place, the differences in the average unit cost on the several systems, and then the differences on each in the cost incident to the different classes of traffic and articles of merchandise, and to the widely varying conditions under which the transportation is conducted. In this unit cost figure no account is taken of the differences in unit cost dependent, among other things, upon differences in the length of haul, in the character of the commodity, in the configuration of the country, in the density of the traffic, in the daily loaded car movement, in the extent of the empty car movement, in the nature of the equipment employed, in the extent to which the equipment is used, and in the expenditures required for its maintenance. Main line and branch line freight, interstate and intrastate, carload and less than carload, are counted alike. The department's error was fundamental in its nature. The use of this factor in computing the operating costs of the log traffic vitiated the whole process of reasoning by which the department reached its conclusion." See, also, Wood v. Vandalia R. Co., 231 U. S. 1, 3, 4, 34 S. Ct. 7, 58 L. Ed. 97.

The difficulties of producing definite proof in a case like the present are obvious: There is not only the difficulty of ascertaining the correct proportion of line-haul cost of trains carrying not only citrus fruit, but other perishables and high-class freight, assignable to the commodity under consideration, including such costs as the maintenance of the right of way; but there is also the difficulty of ascertaining what part of the roadbed and the terminals are to be considered as used in the transportation, and what value should be assigned thereto. Recognizing these difficulties, the use of substi-

tutes under proper circumstances has been approved in some cases. It has been held in Minnesota Rate Cases 1913, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, that data obtained through the keeping of accounts or statistics over a properly selected test period may be used as a proper basis for the determination of transportation costs; and in Atlantic Coast Line R. Co. v. Florida, 203 U. S. 256, 260, 27 S. Ct. 108, 109, 51 L. Ed. 174, the Supreme Court said: "We are aware of the difficulty which attends proof of the cost of transporting a single article, and, in order to determine the reasonableness of a rate prescribed, it may sometimes be necessary to accept as a basis the average rate of all transportation per ton per mile. We shall not attempt to indicate to what extent or in what cases the inquiry must be special and limited. It is enough for the present to hold that there is in the record nothing from which a reasonable deduction can be made as to the cost of transportation, the amount of phosphates transported, or the effect which the rate established by the commission will have upon the income." The Commission itself, in Georgia Public Service Commission v. Atlantic Coast Line R. Co., 186 I. C. C. 157, 187, stated that it is well known that it is impossible, on a large railroad system engaged in the general transportation of all kinds of freight and of passengers, to determine accurately the exact cost of transporting any one commodity.

### Evidence of the Northern Lines.

In view of these inherent difficulties, the petitioners made no effort to ascertain the precise costs of the traffic even to the extent of a test for a limited period, but presented a cost study on a system average car mile basis in the following manner: The total freight car miles, including both loaded and empty cars, and also the total operating expenses and railway taxes, were ascertained for each petitioning carrier from the statistical reports furnished by it to the Interstate Commerce Commission, and these costs were separated as between freight and passenger traffic in accordance with a formula prescribed by the Commission for such separation. Deductions from total freight expenses were made for freight train, car repairs, depreciation, and retirements, since citrus fruit is moved in refrigerator cars, not owned by the carriers but rented at the rate of 2 cents per mile. Then the net freight expense was divided by the total freight car miles and a unit expense per car mile for all freight traffic was ascertained.

It was also necessary to ascertain the investment in road and equipment used in the service in order to calculate the proper return on investment to which the carrier was entitled, and for this purpose, to ascertain the freight proportion of the total investment of the carrier. This was done by taking the total investment as reported to the Commission and computing the freight proportion thereof by applying to the total the percentage which the net operating freight expenses, obtained in accordance with the above-mentioned formula, bore to the total operating expenses. In other words, the investment allocated to freight was determined by the ratio that the net operating expenses for freight bore to the total operating expenses. It is not claimed that the resulting figure accurately represents the total freight investment, but it was used for convenience; and since little or no return was received by the carriers in trunk line territory, if the general thesis of the petitioners is sustained, it is not a matter of great importance in the case to ascertain precisely the amount of the freight investment.

Having thus obtained the system average car-mile cost, the petitioners adopted it as the cost applicable to the carriage of citrus fruit, not indeed as representing the exact costs, but as indicating a figure less than the actual expense incurred in the moving of this kind of traffic. It was emphasized that the use of this method makes possible a much more accurate estimate than if a unit cost figure on a gross ton mile basis had been employed. It was generally agreed that if the latter method were employed, the cost of carrying a light commodity, like citrus fruit, in expedited service, would be underestimated since the gross ton mile basis apportions an unduly large share of the aggregate system expense to heavier classes of traffic, such as coal, which are in fact cheaper to carry.

It is obvious that it was incumbent upon the petitioners to establish the proposition that the cost of handling traffic in citrus fruit is equal to or greater than the car-mile cost, for, otherwise, the foundation of the case as to the confiscatory character of the Commission's order would fall in. It is therefore necessary to examine in some detail the testimony bearing upon this subject.

The petitioners, in order to support their theory, put in evidence the record before the Commission and produced a number of witnesses who qualified as experts in railway

operations and expressed the opinion that the cost of handling citrus fruit on their respective lines was greater than the cost of handling the average or general run of traffic, for a number of reasons that will subsequently appear. The Commission itself, in its report in this case, Atlantic Coast Line R. Co. v. Arcade & A. R. Corp., 194 I. C. C. 757, stated that the evidence before it in general indicated that citrus fruit, like other perishable traffic, is given a specialized expedited service, which is undoubtedly more expensive than the ordinary run of freight; and counsel for the southern lines conceded the correctness of this general conclusion. The evidence on the point falls roughly into two main divisions: (1) Evidence relating to line haul costs incident to the expedited service, reconsignments, and use of refrigerator cars in the traffic; and (2) evidence relating to terminal costs, including large investment, heavy operating costs, and special destination terminal services.

The expedited service accorded citrus fruit, as well as other perishable commodities, is one of the most important elements making for higher costs. Perishable traffic is carried on fast schedules, constructed so as to permit delivery in large destination cities in time to meet established market hours, and the carriers are prompted to exercise a high degree of diligence to maintain these schedules by the legal liability which they may incur in failing to make markets. The increased speed required by the schedules ordinarily necessitates moving the traffic in more lightly loaded trains, and the potential capacity of the locomotives is thus not utilized to the extent that is general with slower freight. In addition, there is considerable fluctuation in the volume of this traffic from day to day, also making for lightly loaded trains to some extent, because of shortage in cars available for scheduled runs; and this condition is especially burdensome to the Richmond, Fredericksburg & Potomac, which at the height of the citrus season frequently has light engine movement both north and south, due to both shortages and excesses in available cars.

The dispatch required by expedited schedules likewise increases the cost at intermediate terminals in inspection and classification, and a consequent increase in the amount of switching which must be done.

Citrus fruit is carried almost exclusively in refrigerator cars which are four or five tons heavier than the average freight car, and consequently the ratio of tare weight to lading tonnage is higher than is the case with freight generally. Moreover, the empty return movement of these cars is much higher than the average, because of their limited usage, the ratio to loaded movement on the Pennsylvania, for instance, being 89 per cent. as against 58.3 per cent. for all cars. And this movement is also expedited.

Reconsignments and diversions are performed without charge to a substantially greater extent on citrus fruit cars than on average traffic in official territory. This involved to a large extent the placing of cars on "hold" tracks for a day or more, and the subsequent selection of cars from such tracks through difficult switching operations. Large clerical and telegraphic expense to carry out the instructions of the shippers is required.

A large element of the costs consists in the investment in destination terminals, a fact to be contrasted with the maintenance of private sidings at private expense for ordinary industrial freight. For instance, the Pennsylvania Railroad, according to the Commission's report, expended $22,479,870 for perishable freight terminals in official territory in the years 1912 to 1930. A larger amount of switching makes the yard cost higher than the average. Perishables are unloaded free in Philadelphia and New York; auction rooms are provided for sales; special notice of arrival is given consignees; heating must be provided in cold weather; inspection of the shipments and cleaning of the terminals must be done. On account of these and other circumstances, the opinion was expressed by experts in transportation service that terminal costs in citrus fruit exceed the average terminal costs; and studies offered to the Commission indicate a partial terminal cost to the Baltimore & Ohio at Philadelphia of $21.18 per car, and to the Pennsylvania at Pittsburg of $16.05, and at New York, $29.60 per car, respectively. These figures were disputed by the southern lines. See Atlantic Coast Line R. Co. v. Arcade & A. R. Corp., 194 I. C. C. 746.

The petitioners also endeavor to show that the principal routes used by the northern lines for the transportation of citrus fruit are relatively more expensive to operate than their respective system lines. Evidence on this point consists chiefly of a detailed description of operating difficulties over the various routes, such as adverse grades, traffic interference because of heavy passenger train density, terminal congestion, drawbridges, and tunnels. Heavy expense has been incurred by the Pennsylvania in

changing the grade of its tracks in populous areas between Wilmington and Jersey City, and in eliminating grade crossings; likewise large expense is involved in the transportation of cars on floats from Jersey City to New York and Brooklyn. The petitioners also introduced certain exhibits to show that the average operating expenses per freight car mile for the year 1929 on the Baltimore Division of the Baltimore & Ohio and the combined eastern region and New York zone of the Pennsylvania were greater than the respective system averages of these roads. The sections mentioned are those over which the Florida citrus fruit is moved. The calculations indicated a unit car-mile cost for the Baltimore Division of the Baltimore & Ohio of 14.61 cents, as compared with a system average of 10.56 cents per car mile; and for the eastern region and New York zone of the Pennsylvania, of 11.59 cents, as against a system average cost of 10.95 cents per mile. There was also testimony tending to show that the cost per car mile on the Pennsylvania for net-transportation expenses alone amounted to 14.2 cents per mile for the divisions along the route from Potomac Yard northward to the principal destinations, as compared with 11.59 cents per mile for the eastern region and New York zone combined.

Relying on the evidence outlined to sustain the propriety of using system average car-mile cost as the car-mile cost of carrying citrus fruit, the petitioners produced calculations to show that the net operating expenses, the taxes, and 5¾ per cent. on the investment, in cents per freight car mile, for the three carriers most concerned, were as follows:

| | Pennsyl-vania | Baltimore and Ohio | Richmond, Fredericksburg and Potomac |
|---|---|---|---|
| Operating expenses | 10.95 | 10.56 | 9.06 |
| Taxes | .91 | .70 | .76 |
| | 11.86 | 11.26 | 9.82 |
| 5¾% on investment | 3.03 | 3.00 | 2.12 |
| | 14.89 | 14.26 | 11.94 |

These unit figures were applied to shipments of citrus fruit from Florida to destinations in official territory during the 1928–1929 shipping season, which is conceded to be a typical period. 29,221 cars were shipped to that part of official territory lying east of central territory, and of this number, 17,324 were used in the calculation, being all of the cars which originated on the Atlantic Coast Line and the Seaboard Air Line, and were moved via Richmond northerly by single-line hauls to destinations on the Pennsylvania or the Baltimore & Ohio Railroad. Cars originating on the Florida East Coast and cars delivered at destination by roads other than the Pennsylvania Railroad and the Baltimore & Ohio Railroad were omitted, because they involved a two or more line haul north or south. Cars moving via Southern Railway and Potomac Yard were omitted for the same reason. Multiple line hauls were eliminated because of the difficulty in making proper allowance as to such hauls for the element of terminal costs of the line involved. During the same season, 8,773 cars moved to central territory, and for 4,662 of these, constituting all the cars moving by single line hauls north of the Ohio river gateways to destinations in central territory, a similar study was presented.

An illustration of the method used by the petitioners is the following table, which shows, as to the above 17,324 cars carried to trunk-line territory, the aggregate operating costs calculated on the car-mile basis and the aggregate revenues from the divisions prescribed by the Commission, to the railroads involved:

| | Pennsyl-vania | Baltimore and Ohio | Richmond, Fredericksburg and Potomac |
|---|---|---|---|
| Cost | $813,918.88 | $74,477.23 | $412,311.20 |
| Revenue | 748,339.98 | 87,845.90 | 411,051.64 |
| Net revenue | $ 65,578.90* | $13,368.67 | $ 1,259.56* |

*Deficit.

It thus appears that the operating expenses and taxes alone exceeded the revenues of the Pennsylvania and the Richmond, Fredericksburg & Potomac railroads and only $13,368.67 was available in the case of the Baltimore & Ohio for income on investment. While petitioners' method of obtaining the cost figures is vigorously contested, the accuracy of the calculations as to revenue is not denied.

Similar calculations were made in regard to the above-mentioned 4,662 cars moving by single line hauls north of Ohio river gateways to central territory. It was estimated that the aggregate operating expenses and revenues of the Pennsylvania Railroad and the Baltimore & Ohio Railroad were as follows:

| | Pennsylvania | Baltimore and Ohio |
|---|---|---|
| Cost of Operating | $71,861.29 | $36,669.18 |
| Revenue | 74,964.42 | 41,111.92 |
| Net revenue | $ 3,103.13 | $ 4,442.74 |

The result to the two lines in both territories, using car-mile unit cost in computing expenses, was thus a net loss of $62,-475.77 to the Pennsylvania, and a net gain of $17,811.41 to the Baltimore & Ohio Railroad Company, with no allowance for return on investment.

The expenses of all other carriers on single line hauls in central territory, estimated by employing a system average car-mile expense for each line, amounted to $123,926.-40; and this figure, deducted from the gross revenue, left a net revenue of $45,061.28. Some of these carriers are intervening petitioners here. But no effort was made to show the individual revenue and expense or net revenue of any carrier in the group; likewise, there was no showing of expenses, individually or in the aggregate, for multiple line hauls in either territory, and all traffic handled by the intervening petitioners in trunk line and New England territory falls within this class.

To complete the estimate of the revenues needed to avoid confiscation, some figures to represent a suitable return on investment must be included in these calculations. The record, as we have seen, contains estimates of the amounts required to furnish a return of 5¾ per cent. to the three petitioners, so far as shipments via Virginia gateways are concerned. These amounts are, $183,694 for the Pennsylvania Railroad, and $75,018 for the Richmond, Fredericksburg & Potomac, for which no revenues are available, since the operating expenses exceed the revenues in the case of these carriers by $65,578 and $1,259, respectively. For the Baltimore & Ohio Railroad, $17,372 is needed for return on investment, which figure is to be compared with the estimated operating profit of $13,368. These figures are estimates only, since, as we have noted, the freight proportion of investment was calculated by arbitrarily assuming that it bears the same ratio to total investment as the freight expenses bear to the total expenses.

The results obtained by this method may be illustrated by its application to a shipment over the Richmond, Fredericksburg & Potomac, and the Pennsylvania Railroad from Richmond to New York, a distance of 346 miles. Applying the ratio for empty to loaded mileage over these roads, it was computed that the empty car was hauled 309 miles, making a total empty and loaded haul of 655 miles. When this figure is multiplied by the average car-mile cost on the two lines, a total of $73.45 for operating expenses and taxes is obtained, to which should be added a car rental of $13.10, making a total of $86.55. This figure is reduced by deducting $2.86, the estimated cost of transporting the ice in the bunkers of refrigerator cars. The result is a total estimated cost of transportation of $83.69 per car, without making any allowance whatever for return on investment. The divisions prescribed by the Commission yield to the northern lines $75 per car for the haul from Richmond to New York for a shipment originating at Orlando, Fla. It follows, if the basis of the calculation is correct, that the revenue allowed by the Commission falls short of the cost by the sum of $8.69 irrespective of any return on the investment.

No question is raised by the parties as to the adequacy of the joint rates on citrus fruit to afford a fair return to carriers both north and south. Studies on the car-mile basis, introduced by the northern lines, show that the aggregate revenue of the principal southern carriers on hauls to Richmond, Va., over and above expenses and a 5¾ per cent. return on investment, amounted to $982,674.76, divided as follows: Atlantic Coast Line, $675,387.32; Seaboard Air Line, $307,287.44. The comparable figure on the gross ton mile basis was $897,669.96, divided in about the same proportions. The southern lines dispute the soundness of all of these cost studies, but offered no proof to show that the joint rates are insufficient. In petitioners' studies, costs are computed on the basis of the shortest routes.

Evidence Offered by the Defendants.

The southern lines attack the fundamental theory of the petitioners that system average car-mile costs may be used to indicate the cost of moving citrus fruit, and offered evidence of expert witnesses, and statistical calculations in support of their position. Stress is put upon the proof which shows that system average costs are based upon the movement of all kinds of commodities, all lengths of haul, and loads per car, varying ratios of loaded to empty movements, movements in carload and less than carload lots, on both main and branch lines; and that the petitioners have used an average cost affected by these many different elements to show the cost of transportation of a single commodity which is affected by a marked peculiarity in divers respects. It is pointed out, by way of illustration, that the average car-mile cost is based upon the movement of freight on the entire system, while in the case of the Pennsylvania and the Baltimore & Ohio, comprising 10,000

miles and 5,500 miles of line, respectively, less than 15 per cent. of the total system mileage was used in the movement of citrus fruit via Potomac Yard in the season of 1928–1929. During the same season, citrus fruit constituted less than .3 of 1 per cent. of the Pennsylvania's total tonnage, with an average load of 16.79 tons per car, while products of mines made up 60.71 of the total tonnage, with an average load of 55.22 tons per car. Similar percentages and tonnages prevailed on the Baltimore & Ohio. The greater weight of heavy tonnage, as compared with the lighter burden of citrus fruit, adds to the expense of the haul. The higher percentage of empty return movement in the citrus traffic also differentiates it from the average movement.

It was also shown that in the use of car-mile unit cost, there is no segregation of terminal from line haul costs, and hence no assurance that the cost of any particular movement can be accurately ascertained. Line-haul cost necessarily varies with the length of the haul, but terminal costs are constant, and if total costs are calculated on a car-mile basis, there is an overstatement or pyramiding of terminal costs whenever the haul under investigation exceeds the system average haul on all traffic. Terminal facilities also vary widely at different places. There were 101 destinations on the Pennsylvania, and 27 destinations on the Baltimore & Ohio in 1929, at which citrus fruit was received. Pyramiding of terminal costs is illustrated in the application of the car-mile unit cost to the movement of citrus fruit on the Pennsylvania in this year. The system average haul for the loaded and empty movement combined was 332 miles; while the average movement of citrus fruit was 416 miles, or an increase of more than 20 per cent., involving an overstatement of terminal costs in the cost studies of this railroad. The freight expenses of the Pennsylvania, allocable to yards and terminals in 1929, amounted to $128,006,991, and when 20 per cent. of this figure is divided by the total car miles on the system (2,741,963,000), there results the sum of .93 cents per car mile, by which the terminal costs have been overestimated. This figure, applied to the total Pennsylvania citrus fruit car miles in trunk-line territory in the 1928–1929 season (6,006,282), shows an overstatement of $55,858.42 in the aggregate cost as computed by the Pennsylvania for that territory.

In addition, the large volume of citrus fruit transported and the heavy density of all traffic moved on the Pennsylvania and the Baltimore & Ohio Railroads in trunk-line territory tends to diminish the cost of transportation therein. Approximately 73 per cent. of the citrus fruit covered by the petitioners' study went to a small number of large cities; for instance, 11,358 cars out of a total of 24,123 cars of citrus fruit transported over the Pennsylvania's lines in trunk-line territory in the 1928–1929 season went to New York City. At the height of the season, the Pennsylvania seldom received less than 50 cars per day at Potomac Yards, and often as many as 200 cars per day, and it invariably operated one and sometimes two solid trains of perishable commodities per day. More than 100,000 cars of perishables moved into the Potomac Yards from the south annually during the period 1928–1930. Pennsylvania trains out of Potomac Yard, consisting of 50 per cent. or more of perishable cars, were similar both in respect to the average number of cars per train and the average adjusted gross tons per train to the average of all Pennsylvania trains out of that yard, and exceeded in these respects the averages for the Pennsylvania system as a whole. A similar showing was made as to the Richmond, Fredericksburg & Potomac, but the reverse was true of the smaller volume of citrus fruit traffic on the Baltimore & Ohio.

Comparing the lines over which citrus fruit moves on the Pennsylvania and the Baltimore & Ohio with the remainder of these systems, it appears that the former, being less than 15 per cent. of each system, are lines of particularly heavy freight traffic density, bearing a ratio of 365 per cent. in the case of the Pennsylvania, and 352 per cent. in the case of the Baltimore & Ohio, to the traffic density of the balance of the system. Similar ratios of passenger traffic density are 558 per cent. for the Pennsylvania, and 550 per cent. for the Baltimore & Ohio. Between Potomac Yard and Jersey City on the Pennsylvania, the freight traffic density is four times as much, and the passenger density eight times as much as on the balance of the system. The effect of heavy freight traffic density is a reduction in the operating expense per unit of traffic for the reason that a large part of the operating expenses remain constant and unaffected by the volume of traffic, and hence as traffic increases, the cost per unit decreases. About two-thirds of maintenance of way and structure expense, 43 per cent. of maintenance of equipment expenses, and a substantial proportion of transportation expenses are constant. Heavy passenger traffic densi-

ty produces a larger spread of expenses common to passenger and freight service, and thereby further decreases freight unit costs.

In reply to the statistical calculations offered by the petitioners, to which reference has already been made, to show that in fact the costs of transportation on these regions of the Pennsylvania and Baltimore & Ohio are heavier than on the respective systems as a whole, the defendants offered a report of the Pennsylvania Railroad' to its stockholders in 1929, which, comparing the eastern region and New York zone with the system as a whole, gave figures showing that on the regions in question, operations were equally or more favorable than on the system as a whole with regard to the total number of tons carried one mile, the gross tons per train, train speed, gross tons per train hour, total cars per train, and pounds of coal per 1,000 gross ton miles.

Relying on these considerations, the argument was advanced by the defendants that the cost studies of the northern lines rest upon a basis that is merely a statistical generalization, and does not show the actual cost of moving citrus fruit; and it was insisted that if system averages are to be used at all, the gross ton mile basis of calculating costs should be adopted. On this basis, the three petitioners, according to the defendants' estimates, realized a net income of $182,838 on single line hauls in trunk line territory in 1928 and 1929, and all the carriers in central territory a net income of $91,024, or in each case, a sufficient income to provide some return on investment. These figures are in dispute, but the point need not be considered, for it is probable when the light loading and expedited service of citrus fruit are considered, that costs measured on the average gross ton-mile basis would not be as great as the cost of carrying citrus fruit.

Very great emphasis is placed upon the past experience of the parties in handling the traffic, and upon the historic fact that the northern lines for a period of twenty years prior to November 9, 1928, when the Florida Case was decided, voluntarily accepted a return for their services less than the revenues which accrued to them under the divisions prescribed by the Commission. During the shipping season of 1928-1929, all northern lines in the aggregate received upon 29,193 cars in trunk-line and New England territory $62,835.90 more than they would have received under the divisions previously in force. There were substantial increases to port cities, such as New York,

Philadelphia, Boston, Baltimore, and Washington, which were partially offset by substantial decreases to interior points, notably Pittsburgh and Scranton. The changes reflect differences between interior points and port cities, and to a great degree corrections of inconsistencies in the old rates and divisions noted in the Commission's report, Atlantic Coast Line R. Co. v. Arcade & A. R. Corp., 194 I. C. C. at page 737.

A similar comparison as to central territory discloses that on 8,509 cars therein in the same season, the northern carriers received $6,115.99 less under the prescribed divisions than they would have received under those previously in effect.

It is noteworthy that the Chesapeake & Ohio Railroad one of the intervening carriers claiming that the present order as to divisions is confiscatory, had a cost of only $50.01 per car on its haul from Cincinnati to Chicago in the past season, as compared with an average revenue of $67 per car. Moreover, this company had a net revenue of $8,206.41 in excess of operating expenses and taxes on all of its hauls in this season; and a net revenue of less than $5,200 would have afforded a 5¾ per cent. return.

The willingness of the northern lines to accept voluntarily the prevailing divisions on California citrus fruit is not without significance. The Pennsylvania and the New York, New Haven & Hartford Railroads accept on the movement of California oranges considerably less revenue than they receive for similar movements under the prescribed divisions on Florida citrus fruit, and it appears that if the expenses on California fruit are determined on the car-mile basis, these roads suffer even larger deficits in this respect than those of which they complain in the pending case.

Conclusions on the Issue of Confiscation.

The evidence and the arguments have been set out in some detail in order to give an adequate picture of a controversy that was presented with great industry and ability on both sides. The nature of the proof was necessarily general in character, once it was determined by petitioners that it was not practicable to furnish specific figures showing actual costs. Whether tests designed to show precise costs could have been made, at least in some particulars, it is useless to speculate. We must take the case as we find it, and we can only say that the evidence does not convince us that system average freight car-mile cost may be safely used to ascertain the cost of carrying citrus fruit.

There are indeed many expressions of opinion in general terms that citrus fruit is more expensive to transport than "the ordinary run of freight." But the meaning of this phrase is uncertain, and we have no assurance that the cost of carrying the ordinary run of freight is the same as the system average car-mile cost. In short, we are unable to say that the proposition on which the petitioners rest their case has been established. Indeed, substantial evidence offered on behalf of the defendants indicates that it is probably not true. The special conditions surrounding the movement of citrus fruit, and especially the transportation by the northern lines of trains made up wholly or in large part of citrus and other perishable foods delivered to them in large quantities at a particular gateway, suggest that in a sense the commodity is dealt with by them in wholesale rather than in retail quantities. Again, the peculiar conditions generally applicable to the movement of freight on the Pennsylvania Railroad between Richmond and New York make it extremely hazardous to apply to that large portion of the whole movement of citrus fruit which is transported between these points, average figures obtained by a statistical generalization of uncertain meaning.

It is most persuasive to us that the expert opinion offered by the northern lines conflicts with the actual practice they have pursued, for although other considerations than profit may have induced them to accept the divisions in effect after November 9, 1928, it is difficult to believe that they would have acquiesced in divisions actually confiscatory. A calculation derived from the exhibits filed by the petitioners shows that such was the effect of the divisions which the Pennsylvania Railroad received, if the car-mile cost basis may be properly used. On that basis, the total combined expenses of the Pennsylvania Railroad and the Richmond, Fredericksburg & Potomac on 14,573 cars moving to trunk-line territory in 1928–1929, as calculated by the petitioners, was $1,160,756.28. The corresponding divisions which these roads exacted as collecting carriers amounted to $1,161,028.69; so that a combined net revenue of only $272.41 was produced. We have not been able to segregate the revenues of the two roads from the exhibits in the record, but it shows that the divisional agreement between these carriers has been in effect for many years. Under the divisions prescribed by the Commission in this case, the Pennsylvania suffered a loss according to the petitioners' calculations on

car-mile basis of over $65,000, and the Richmond, Fredericksburg & Potomac a loss of only $1,259. The fair inference is that if the same plan of divisions between the two named carriers was applied, the divisions between the northern and southern lines as settled would have produced a substantial loss to the Pennsylvania, and a considerably larger income to the Richmond, Fredericksburg & Potomac than the sum of $272.41. A similar computation for movements over the Baltimore & Ohio and the Richmond, Fredericksburg & Potomac shows that they together realized a net income of $34,623.03 under the divisions as settled, if the car-mile basis were applied. The net revenue to the three roads combined would be $34,-895.44. It follows that the divisions, as settled, were themselves confiscatory on the car-mile basis, at least as to the Pennsylvania, and also as to the three roads combined under the group confiscation theory of the petitioners. When this weighty consideration affecting the stronger northern lines, and especially the one enjoying the largest revenues from the traffic, is thrown into the scale, the conclusion we have reached upon the main proposition of the petitioners is confirmed.

### Conclusions in Regard to Other Issues.

 The contention that the order of the Commission is arbitrary and in excess of its statutory powers, because it based its findings almost exclusively on the single element of financial need, is founded on the references to this subject in the Commission's report. A reading of the report, however, shows that whilst this element was considered an important reason, the historic practice furnished an equal or greater reason for the result that was reached. This appears in the following statement with which the minority opinion of the Commission concluded (Atlantic Coast Line R. Co. v. Arcade & A. R. Corp., 194 I. C. C. 762):

"To reach their conclusions, the majority are obliged to lean heavily on history and on the fact that while both sets of lines are badly off financially, the southern lines appear to be worse off than the northern. History does not appeal to me as a factor entitled to much weight, and while financial need is doubtless important, I cannot weigh it in the balance near so heavily as do the majority."

It is not our province to decide, and we express no opinion, as to whether a larger allowance to the northern lines would not have been fair and reasonable under all the

circumstances; for it is well settled that the wisdom of an order of the Commission is not a question for judicial determination. The court must confine itself to the ultimate question as to whether the Commission acted within its powers. Interstate Commerce Commission v. Union P. R. Co., 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed. 308; United States v. New River Co., 265 U. S. 533, 44 S. Ct. 610, 68 L. Ed. 1165; Assigned Car Cases, 274 U. S. 564, 580, 47 S. Ct. 727, 71 L. Ed. 1204; New England Divisions Case, 261 U. S. 184, 203, 43 S. Ct. 270, 67 L. Ed. 605. It is equally well established that under the statute, the Commission in making a division of rates may, in the public interest, take into consideration the financial needs of the weaker roads, United States v. Abilene & S. R. Co., 265 U. S. 274, 44 S. Ct. 565, 68 L. Ed. 1016; and that it is not incumbent upon the Commission in any case to designate the relative weight which it gives to the various elements that under the law it is obliged to take into consideration in reaching its results, United States v. Abilene & S. R. Co., 265 U. S. 274, 285, 44 S. Ct. 565, 68 L. Ed. 1016; Beaumont, S. L. & W. R. Co. v. United States, 282 U. S. 74, 83, 51 S. Ct. 1, 75 L. Ed. 221.

■ Nor do we find that the Commission erroneously based its conclusion as to the financial need of the southern lines incident to the transportation of citrus fruit upon the average rate of return on all their property from their total business. This contention depends largely on the calculations of the petitioners, made on the basis that we have found to be untenable, from which they conclude that the Commission's order gives to the southern lines abnormally large divisions far in excess of a fair return on their investment, while reducing the northern lines to a point at which nothing is left for such return.

■ When this calculation is put aside, the remaining question is whether the Commission may single out for decision divisions on one commodity when revised divisions of rates on commodities generally have been requested and, in doing so, may consider the financial needs of the respective parties. There is no inherent impropriety in considering the rate on one commodity alone, either as to its amount or its proper division. Such decisions are frequently required. In the pending case, the selection of citrus fruit for prior decision came about quite naturally, since the Florida Case was decided in 1928 and a settlement of the dispute as to the divisions thereof has been long delayed. It does not seem to have been arbitrary or unreasonable first to decide the proper divisions of citrus fruit rates alone, and it was incumbent upon the Commission in reaching its decision to give weight to the relative financial needs of the interested roads.

■ We are satisfied also that the retroactive feature of the Commission's order requiring the petitioners on or about December 1, 1934, to adjust divisions in accordance with the methods prescribed in the Commission's order on shipments which moved subsequent to November 22, 1930, did not amount to an order for the payment of money, in violation of the Seventh Amendment. There is indeed no contention in the case that such is the effect of the order; and we agree with the opinion expressed by counsel on both sides that the order merely requires that an account be stated, and that the amount due the southern lines as a whole be ascertained, leaving to them to make collection in such manner as they may see fit to pursue.

A decree will be signed dismissing the petition and intervening petitions filed by the plaintiffs and interveners. It is assumed that the full statement of facts in this opinion comprehends all of the findings of fact which the parties to the case desire; but if it does not, additional proposed findings of fact may be submitted to the court.