# BALTIMORE & OHIO RAILROAD CO. ET AL. *v.* UNITED STATES ET AL.

No. 312.   Argued January 14, 15, 1936.   Reargued March 3, 4, 1936.—Decided May 18, 1936.

Mr. E. L. Beach, with whom Messrs. Joseph F. Eshelman, M. Carter Hall, Jervis Langdon, Jr., Charles R. Webber, and Frederic D. McKenney were on the brief, for appellants.

Mr. Edward M. Reidy, with whom Solicitor General Biggs, Assistant Attorney General Dickinson, and Messrs. Daniel W. Knowlton and Elmer B. Collins were on the brief, for the United States and Interstate Commerce Commission, appellees.

Mr. Frank W. Gwathmey, with whom Messrs. Charles Clark and James F. Wright were on the brief, for Atlantic Coast Line R. Co. et al., appellees.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This is a suit in equity [1] brought by appellants against the United States to set aside and permanently to enjoin the enforcement of an order of the Interstate Commerce Commission based on its report made July 3, 1933, and modified in accordance with its report of January 8, 1934.[2] The commission, July 10, 1928, had prescribed rates on citrus fruit [3] from places of production in Florida to points in Official Classification Territory.[4] The order

---

[1] 28 U. S. C., §§ 41 (28), 44–46.

[2] 194 I. C. C. 729; 198 I. C. C. 375.

[3] 144 I. C. C. 603.

[4] Official classification territory, generally speaking, includes territory east of the Mississippi River and north of the Ohio and Potomac Rivers, including New England, portions of Virginia and West

here in controversy prescribes divisions as between southern carriers hauling from Florida to Richmond, Virginia, and other gateways, and northern carriers hauling to destinations, and prescribes adjustment to be made by the latter.[5]   The Boston & Maine and other northern

Virginia, and certain destinations in Missouri, Iowa and Wisconsin. See map, 31 I. C. C. 350.

"Official territory is subdivided into three subterritories, which have been recognized in rate making for many years.  These are New England, lying east of the eastern boundary of New York; trunk-line territory, which extends westward from there to a line drawn through Buffalo and Salamanca, N. Y., Warren, Oil City, Pittsburgh, and Washington, Pa., Wheeling, Parkersburg, Charleston and Gauley, W. Va., these cities being usually referred to as the 'western termini' of the trunk lines; and Central Freight Association territory, referred to herein as central territory, lying west of that line." Eastern Class Rate Investigation, 164 I. C. C. 314, 322.

| [5] *Scale of southern factors* | | *Scale of northern factors* | |
|---|---|---|---|
| 600 miles and less | 161 | 240 miles and less | 44 |
| 620 miles and over 600 | 164 | 260 miles and over 240 | 46 |
| 640 miles and over 620 | 167 | 280 miles and over 260 | 49 |
| 660 miles and over 640 | 170 | 300 miles and over 280 | 51 |
| 680 miles and over 660 | 173 | 325 miles and over 300 | 54 |
| 700 miles and over 680 | 176 | 350 miles and over 325 | 57 |
| 720 miles and over 700 | 179 | 375 miles and over 350 | 60 |
| 740 miles and over 720 | 182 | 400 miles and over 375 | 63 |
| 760 miles and over 740 | 185 | 425 miles and over 400 | 66 |
| 780 miles and over 760 | 188 | 450 miles and over 425 | 69 |
| 800 miles and over 780 | 191 | 475 miles and over 450 | 72 |
| 825 miles and over 800 | 194 | 500 miles and over 475 | 75 |
| 850 miles and over 825 | 197 | 525 miles and over 500 | 78 |
| 875 miles and over 850 | 200 | 550 miles and over 525 | 81 |
| 900 miles and over 875 | 203 | 575 miles and over 550 | 84 |
| 925 miles and over 900 | 206 | 600 miles and over 575 | 87 |
| 950 miles and over 925 | 209 | 625 miles and over 600 | 90 |
| 975 miles and over 950 | 212 | 650 miles and over 625 | 93 |
| 1,000 miles and over 975 | 215 | 675 miles and over 650 | 96 |
| | | 700 miles and over 675 | 99 |

The order directed carriers to adjust divisions in accordance with the basis above indicated on shipments which moved subsequent to November 22, 1930.

carriers intervened as parties plaintiff.[6]   The commission and the Atlantic Coast Line and other southern carriers intervened as parties defendant.[7]   The complaint assails the order upon the grounds that it is based on a misconstruction of the Act and is confiscatory.   The case was tried by three judges.   In addition to the evidence given before the commission there were offered and received at the trial the testimony of many witnesses and much documentary evidence.   The court held plaintiffs not entitled to relief and dismissed the case.[8]   Th y appealed.[9]

The history and structure of the joint rates shed light on questions to be decided.   June 25, 1908, the commission found the rates, called "gathering rates," from places of shipment in Florida to junctions in the northern part of that State reasonable, but that the charges for transportation from the junctions to the north were unreason-

---

[6] The Boston & Maine Railroad; The New York Central Railroad Company; Pittsburgh and Lake Erie Railroad Company; The New York, New Haven & Hartford Railroad Company; The Central Railroad Company of New Jersey; Reading Company; Lehigh Valley Railroad Company; The Delaware, Lackawanna & Western Railroad Company; The Delaware & Hudson Railroad Corporation; Erie Railroad Company; Pere Marquette Railway Company; Charles M. Thompson, Trustee of The Chicago & Eastern Illinois Railway Company; The Chesapeake and Ohio Railway Company.

[7] Atlantic Coast Line Railroad Company; W. R. Kenan, Jr., and S. M. Loftin, receivers of the Florida East Coast Railway Company; Georgia, Southern & Florida Railway Company; L. R. Powell, Jr., and Henry W. Anderson, receivers of the Seaboard Air Line Railway Company; Southern Railway Company; Winston-Salem Southbound Railway Company; Florida, Central & Gulf Railway; Fort Myers Southern Railroad Company; Jacksonville, Gainesville & Gulf Railway; Tampa Southern Railroad Company; Tavares and Gulf Railroad Company; Louisville and Nashville Railroad Company; The Cincinnati, New Orleans and Texas Pacific Railway Company.

[8] 9 F. Supp. 181.

[9] 28 U. S. C., § 47 (a).

able.  It prescribed "proportionals" which were added to the gathering rates to make joint rates applicable over through routes to destinations.  Included in the proportionals were stated amounts, called "specifics," per box of estimated weight of 80 pounds to cover hauls beyond the gateways.  These specifics went to the northern lines and constituted their share of the joint rates.[10]

In 1915 the commission allowed the carriers in official territory a general rate increase of five per cent.,[11] and in 1917 granted an additional 15 per cent.[12]  These increases were applicable generally to interterritorial hauls.  The specifics for northern lines were not advanced.  In 1918, while the carriers were under federal control, the director general raised rates 25 per cent.  The divisions to the southern and northern lines were increased by that ratio.  In 1920, after the railroads were returned to their owners, the commission granted to carriers in the southern group a general rate increase of 25 per cent. and to those in the eastern group, which included the northern lines here involved, an advance of 40 per cent.  It also authorized charges for interterritorial hauls to be raised by 33⅓%.[13]  While that was enough to increase the southern carriers' shares by 25 per cent. and those of the northern lines by 40 per cent. in harmony with the respective rate increases, each group of carriers received divisions raised by 33⅓ per cent.  The northern lines emphasize the fact that if their divisions had kept step with rates in that territory they would have been increased four times, whereas in fact their divisions did not share at all in either of the first two advances and only partially in the fourth, i.e., 33⅓ instead of 40 per cent.

[10] Florida Fruit & Vegetable Shippers' Protective Assn. v. A. C. L. R. Co., 14 I. C. C. 476.

[11] The Five Per Cent Case, 31 I. C. C. 351; 32 I. C. C. 325.

[12] Fifteen Per Cent Case, 45 I. C. C. 303.

[13] Ex parte 74, 58 I. C. C. 220.

The joint rates prescribed by the commission's order of July 10, 1928, were specified amounts per 100 pounds. The assumed weight of 80 pounds per box to which were applied the specifics to cover hauls of the northern carriers was too low. While the commission failed definitely to find actual average weight per box, its report distinctly indicates that it was about 90 pounds.[14] After the taking effect of the new rates the northern lines in trunk line and New England territories took, out of the freight charges they collected, and retained as their divisions per 100 pounds 25 per cent more than the specific per box. The northern lines in central territory adopted 90 pounds as the basis on which to make conversion of the rate per box to rate per 100 pounds. The increase was slightly over 11.1 per cent.

The divisions were not satisfactory to either group of carriers. November 22, 1930, the Atlantic Coast Line and other southern carriers filed their complaint [15] requesting the commission to condemn the divisions of citrus fruit rates to trunk line and New England territories, then being received by them, as a violation of the requirements of § 1 (4), to prescribe just, reasonable and equitable divisions in accordance with § 15 (6), and to require adjustment and refund to be made by northern lines in respect of transportation subsequent to the complaint. January 3, 1931, the commission instituted a general investigation [16] in respect of divisions of joint interterritorial rates between official and southern territory. April 20, 1931, the northern lines filed a cross-complaint. To prevent duplication, the general investigation, so far as it concerned divisions of rates on citrus fruit in central territory, was set for hearing on the same record as the complaint of the southern lines in respect

[14] 144 I. C. C. at pp. 615, 616, 626.
[15] Docket No. 24,069.
[16] Docket No. 24,160.

of divisions of rates to trunk line and New England terri-
tory.[17] Thus the issue concerning divisions of citrus fruit
rates from Florida to destinations in official territory was
segregated from the broader controversy. The order here
assailed assigns to appellants divisions yielding more
than did those accepted by them for a long time prior to
the taking effect of the rate order of July 10, 1928.

There was before the commission no question as to the
validity of the joint rates. There was no claim that they
were not sufficient to cover "out-of-pocket costs," i. e.,
the amount by which performance of the service covered
by the rates caused operating expenses and taxes to be
higher than otherwise they would have been. Nor was
it suggested that they were confiscatory, i. e., not suffi-
cient to cover operating expenses and taxes justly appor-
tionable to the traffic plus an amount reasonably suffi-
cient in the circumstances to constitute just compensa-
tion for the use of the carriers' property in that service.
The division of presumably reasonable rates was the only
problem before the commission. Neither complaint al-
leged that existing divisions were not more than sufficient
to cover the out-of-pocket costs or that they were con-
fiscatory.

The commission was required to decide whether, in
respect of the joint rates, the carriers had discharged the
duties imposed upon them by § 1 (4), i. e., "to establish
just, reasonable, and equitable divisions thereof as be-
tween the carriers . . . participating therein which shall
not unduly prefer or prejudice any of such participating
carriers." The prescribing of divisions is a legislative
function.[18] Exertion of that power by the commission
is conditioned upon its finding after a full hearing that

---

[17] 194 I. C. C. at p. 730.

[18] *Terminal R. R. Assn.* v. *United States,* 266 U. S. 17, 30. Cf.
*Prentiss* v. *Atlantic Coast Line,* 211 U. S. 210, 226–227. *Louisville &
Nashville R. Co.* v. *Garrett,* 231 U. S. 298, 305, 307.

the divisions then in force do not, or in the future will not, comply with the specified standards. In proceedings to determine and prescribe divisions the commission is governed by §§ 1 (4), 15 (6), 15a (2); it is not required or authorized to investigate or determine whether the joint rates are reasonable or confiscatory. The question whether it complied with the requirements of the Act does not depend upon the level of the rates or the amounts of revenue to be divided. The purpose of the provisions just cited is to empower and require the commission to make divisions that colloquially may be said to be fair.[19]

But this does not imply that, without regard to amount, the carriers are bound to accept prescribed divisions. Congress is without power, directly or through the commission, to require them to serve the public at rates that are confiscatory. When made in accordance with the Act, the commission's orders prescribing divisions are the equivalent of Acts of Congress requiring the carriers to serve for the amounts specified. Taken, as they must be, in connection with the duties to the public imposed by law upon the carriers, they command service and for that purpose expropriate the use of carriers' property. If when made the prescribed divisions are or later shall become less than just compensation, the carriers may not be required to serve therefor.[20] And, if after appropriate effort they fail to obtain divisions of non-confiscatory joint rates that do constitute just compensation for their services including the use of their properties,

---

[19] *New England Divisions Case*, 261 U. S. 184, 195, 204. *United States* v. *Abilene & Southern Ry. Co.*, 265 U. S. 274, 284–286, 291. *Brimstone R. & C. Co.* v. *United States*, 276 U. S. 104, 115–117. *Beaumont, S. L. & W. Ry.* v. *United States*, 282 U. S. 74, 82, 89.

[20] *New England Divisions Case*, 261 U. S. 184, 195. *Dayton-Goose Creek Ry.* v. *United States*, 263 U. S. 456, 477, 485 *et seq.* *United States* v. *Abilene & Southern Ry. Co.*, 265 U. S. 274, 285. *Beaumont, S. L. & W. Ry.* v. *United States*, 282 U. S. 74, 88.

the carriers may by suit in equity have the order prescribing, or requiring to be kept in force, the challenged divisions adjudged void and its enforcement permanently enjoined.[21] Section 15. (6) requires the commission on complaint of any participating carrier to determine whether existing divisions are just, reasonable and equitable and, if not, to prescribe others that do comply with the law. Its denial of relief from existing divisions operates to direct service under them. Though negative in form, the order of denial is affirmative in effect. In some circumstances carriers may accept rates or divisions that do not yield enough to cover operating expenses and taxes that are fairly apportionable to the service plus a reasonable return for the use of their railroads. If revenues yielded exceed the amounts by which operating expenses are increased on account of the service covered by such charges, then legitimately the carriers' net earnings may thus be enhanced. When conditions permit, such rates or divisions may be established and kept in force without detriment to competing carriers, shippers, other transportation or the public. Just as an owner may sell his property for less than the amount he would be entitled to have upon expropriation, so may carriers, conditions warranting it, render service for less than, by exertion of sovereign power, they could be compelled to accept.

1. Appellants maintain that the order is arbitrary and in excess of statutory power "because the commission erroneously subordinated all matters, which under § 15 (6) . . . it is required to consider to the element of southern lines' supposed 'financial need.' "

In substance, Congress by that paragraph authorizes the commission to take into account all that is relevant to the ascertainment of fair divisions. While presumed

---

[21] Judicial Code, § 24 (28), 28 U. S. C., § 41 (28). *Alton R. Co.* v. *United States,* 287 U. S. 229. *United States* v. *New River Co.,* 265 U. S. 533, 540. Cf. *Chicago Junction Case,* 264 U. S. 258, 263.

valid, its order may be annulled if shown to rest on a misconstruction of the Act or upon inadequate or unsupported findings of fact.[22] The commission alone is authorized to decide upon weight of evidence or significance of facts. There is no single test by which "just," "reasonable" or "equitable" divisions may be ascertained; no fact or group of facts may be used generally as a measure by which to determine what division will conform to these standards. Considerations that reasonably guide to decision in one case may rightly be deemed to have little or no bearing in other cases. Error as to the weight to be given financial needs, operating costs or other material facts is not a misconstruction of the Act.

The report shows that the commission received much evidence bearing upon the standards set by § 15 (6) to govern it in making the divisions. Appellants' claim that the order rests exclusively upon the southern lines' financial needs is negatived by the record. Many other facts were shown to have been presented and considered. There is no requirement that the commission specify the weight given to any item of evidence or fact or disclose mental operations by which its decisions are reached.[23] Useful precision in respect of either would be impossible. And it would be futile upon the record to attempt defi-

---

[22] *Interstate Commerce Comm'n* v. *Louisville & Nashville R. Co.*, 227 U. S. 88, 92. *Manufacturers Ry. Co.* v. *United States*, 246 U. S. 457, 481. *Chicago Junction Case*, 264 U. S. 258, 265. *United States* v. *Abilene & Southern Ry. Co.*, 265 U. S. 274, 291. *Brimstone R. & C. Co.* v. *United States*, 276 U. S. 104, 116–117. *St. Louis & O'Fallon Ry. Co.* v. *United States*, 279 U. S. 461, 487. *Florida* v. *United States*, 282 U. S. 194, 214–215. *United States* v. *B. & O. R. Co.*, 293 U. S. 454, 462 *et seq.* *Atchison, T. & S. F. Ry.* v. *United States*, 295 U. S. 193, 202.

[23] *Meeker* v. *Lehigh Valley R. Co.*, 236 U. S. 412, 427. *Florida* v. *United States*, 282 U. S. 194, 215. *United States* v. *B. & O. R. Co.*, 293 U. S. 454, 464. Cf. *Beaumont, S. L. & W. Ry.* v. *United States*, 282 U. S. 74, 86.

nitely to ascertain the weight assigned to any fact or argument in prescribing the divisions. We find no support for appellants' claim.

2. Appellants also maintain that the order is in excess of power granted by the Act because, as they assert, the commission considered rates of return from the carriers' entire operations on all their railroad property instead of fair return from transportation of citrus fruit on the use fairly attributable to that service.

More specifically, the substance of their claim is that the commission transgressed or disregarded the clause of § 15 (6) which requires that it "shall give due consideration, among other things, to . . . the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation. . . ." Their contention assumes and depends upon a construction of the quoted clause that would limit consideration of the return to services covered by the divisions under consideration and prohibit taking into account returns from all service. But that is not the meaning of the clause. The language, "property held for and used in the service of transportation," is broad enough to include all carrier property. It requires no discussion to demonstrate that § 15 (6) authorizes the commission to take into account and give due weight to revenues from all transportation service, the operating expenses and taxes chargeable to the same and the amounts available as compensation for the use of all carrier property. And unquestionably the paragraph also empowers the commission to take into account the revenues, expenses, taxes and returns attributable to the service covered by the divisions under consideration. The record shows that the commission received and considered evidence in relation to both these matters of fact.

The question whether the carriers in the southern or northern groups were in the worse financial position was a close and difficult one. After full hearing, the commission decided that the needs of the southern lines were greater. It appears to have given much weight to that fact. Four members dissented and filed an opinion in which they compared and commented on the prescribed divisions in substance as follows:

For a haul of 600 miles the northern factor is 87 and the southern 161. The latter is 85 per cent. higher than the former. The average hauls are about 825 miles in the south and 375 miles in the north. For these distances the factors are 194 for the south and 60 for the north, or 0.235 per mile for the longer haul in the south and 0.160 per mile for the shorter haul in the north. The advantage per mile is 47 per cent. for the south. Taking into consideration the respective lengths of haul and the fact that divisions, like rates, should decrease per mile as the length of haul increases, this 47 per cent. checks well within the 85 per cent. in the first test.

For the average southern haul of 825 miles the southern factor is 94 per cent. of the corresponding first-class rate, whereas the northern factor is 62.5 per cent. Yet the southern class rates average more than 30 per cent. higher than the eastern class rates, and the commission has several times found that this difference is not fully justified by transportation conditions.

Transportation conditions in Florida are less favorable than in the south generally; but a Florida arbitrary is added to the rate. It is deducted before proration and added to the southern division of the balance of the joint rate. Gathering expense is high but so is delivery expense at destination. The commission was obliged to lean heavily on history and on the fact that, while both sets of carriers are badly off financially, the southern lines appear to be worse off than the northern. Historical

considerations were not entitled to much weight. While financial need is important, the report and order of the commission gave it too much weight.

The wide difference of opinion among the members may suggest doubt as to some basic findings of fact, but it gives no support to appellants' claim that the commission acted arbitrarily or in excess of powers granted by the Act. The legal effect of the challenged report and order is the same as if supported by all members of the commission.[24] Although it may be plain that, if considered without regard to the facts other than relative transportation and costs of the service, the divisions would seem extremely favorable to the southern lines, the commission's findings based on evidence and its determination as to the significance of pertinent facts found are conclusive. Appellants' contention cannot be sustained.

3. Before taking up appellants' claim of confiscation, some preliminary questions require consideration.

At the trial the United States and commission moved that no evidence be received other than that contained in the record before the commission. The court denied the motion. Counsel for the United States and commission do not here claim that the ruling was erroneous. But it has been suggested that the trial court should not have received evidence other than that introduced before the commission; that it was not permitted to make findings but was bound to accept those of the commission if supported by evidence. Decisions in lower federal courts

---

[24] *Boyle* v. *Zacharie*, 6 Pet. 348. *Williams* v. *Eggleston*, 170 U. S. 304, 311. *Matthews* v. *Clark*, 105 S. C. 13, 19; 89 S. E. 471. *L. D. Willcutt & Sons Co.* v. *Driscoll*, 200 Mass. 110, 115; 85 N. E. 897. *Feige* v. *Michigan Central R. Co.*, 62 Mich. 1, 4; 28 N. W. 685. *Lombard* v. *Lombard*, 57 Miss. 171, 174. Cf. *McDowell* v. *Peyton*, 10 Wheat. 454, 461. *Woodruff* v. *Parham*, 8 Wall. 123, 139.

touching the points thus raised are not harmonious.[25] Their determination has an important bearing upon the decision here to be made. It is therefore necessary to decide what, in respect of admission and consideration of evidence, should have been the scope of the trial in the district court.[26]

There is no statute that can be held to limit as suggested trial of an issue of confiscation. No question as to compensation in the constitutional sense was raised by the complaints to the commission. The issues there concerned only the fairness of divisions. Prior to the taking effect of the order, appellants filed a petition for rehearing in which they claimed that its enforcement would confiscate their property; they then made substantially the same contentions as they make in this suit and sought opportunity to support them by evidence in order to obtain the commission's findings of fact and decision upon the question of confiscation. But the commission denied their application. That denial of hearing amounted to a command of the commission that, notwithstanding their petition to it invoking constitutional protection, appellants must make the specified adjustment involving the payment of enormous sums and use their property to serve the public for the compensation specified in the order. As the carriers' application to the commission for just, reasonable and equitable divisions under § 15 (6) raised no question of confiscation, its findings in the report may not be construed as addressed to that issue.

---

[25] *Denver Union Stock Yard Co.* v. *United States,* 57 F. (2d) 735, 739. *St. Joseph Stockyards Co.* v. *United States,* 58 F. (2d) 290, 295. *Morgan* v. *United States,* 8 F. Supp. 766, 769. *Union Stock Yards Co.* v. *United States,* 9 F. Supp. 864, 875. *St. Joseph Stock Yards Co.* v. *United States,* 11 F. Supp. 322, 326. *American Commission Co.* v. *United States,* 11 F. Supp. 965, 969,

[26] Cf. *King Mfg. Co.* v. *Augusta,* 277 U. S. 100, 102.

4. There is a wide and fundamental difference between the question whether the commission, in prescribing divisions found by it to be just, reasonable and equitable, complied with the procedural requirements of the Act, and whether, if enforced against objecting carriers, the order will confiscate their property. The commission's findings of fact in the field first mentioned, if based on evidence, are conclusive. But, upon the question whether prescribed divisions constitute just compensation within the meaning of the Fifth Amendment, Congress is without power conclusively to bind the carriers. As the Congress itself could not be, so it cannot make its agents be, the final judge of its own power under the Constitution. Congress has no power to make final determination of just compensation or to prescribe what constitutes due process of law for its ascertainment.[27]

In Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, this court held repugnant to the due process clause of the Fourteenth Amendment a Minnesota statute construed to provide that rates prescribed by the state commission shall be final and conclusive as to what are equal and reasonable charges and that as to reasonableness there can be no judicial inquiry. The court said (p. 458): "The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination. If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus,

---

[27] Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 276. St. Joseph Stock Yards Co. v. United States, ante, p. 38.

in substance and effect, of the property itself, without due process of law and in violation of the Constitution of the United States."

In *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, this court held repugnant to the Fifth Amendment an Act of Congress purporting to exclude an element of value. It said (p. 327): "By this legislation, Congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial and not a legislative question. The legislature may determine what private property is needed for public purposes—that is a question of a political and legislative character; but when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through Congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry."

In *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, a fully considered case presenting the question whether a circuit court of the United States had power to enjoin enforcement of confiscatory state-made railroad rates, this court, upon an abundance of authority found in the earlier decisions, held that it had. The opinion declares (p. 399): "These cases all support the proposition that while it is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates for carriage, it is within the scope of judicial power and a part of judicial duty to restrain anything which, in the form of a regulation of rates, operates to deny to the owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property. There is nothing

new or strange in this. It has always been a part of the judicial function to determine· whether the act of one party (whether that party be a single individual, an organized body, or the public as a whole) operates to divest the other party of any rights of person or property. In every constitution is the guarantee against the taking of private property for public purposes without just compensation. The equal protection of the laws which, by the Fourteenth Amendment, no State can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law, and not a government of men, and it must never be forgotten that under such a government, with its constitutional limitations and guarantees, the forms of law and the machinery of government, with all their reach and power, must in their actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held."

*Seaboard Air Line* v. *United States,* 261 U. S. 299, was a suit to recover just compensation for expropriated land. A jury found value at the time of the taking. The district court entered judgment for that amount with interest from the date of taking. The Circuit Court of Appeals held the owner not entitled to interest. Here its judgment was reversed and that of the district court affirmed. We said (p. 306): "The Constitution safeguards the right [to just compensation] and § 10 of the Lever Act directs payment. The rule above referred to, that in the absence of agreement to pay or statute allowing it [Jud. Code, § 177; 28 U. S. C., § 284] the United States will not be held liable for interest on unpaid accounts and claims, does not apply here. The requirement

that 'just compensation' shall be paid is comprehensive and includes all elements and no specific command to include interest is necessary when interest or its equivalent is a part of such compensation."

*United States* v. *New River Collieries Co.*, 262 U. S. 341, involved the question of pay for requisitioned coal. We said (pp. 343–4): "The ascertainment of compensation is a judicial function, and no power exists in any other department of the government to declare what the compensation shall be, or to prescribe any binding rule in that regard." See *Davis* v. *Newton Coal Co.*, 267 U. S. 292, 301. *Phelps* v. *United States*, 274 U. S. 341.

In *West* v. *C. & P. Tel. Co.*, 295 U. S. 662, called upon to decide whether the order of a state commission prescribing charges for telephone service was confiscatory, we said (p. 671): "When the property itself is taken by the exertion of the power of eminent domain, just compensation is its value at the time of the taking. So, where by legislation prescribing rates or charges the use of the property is taken, just compensation assured by these constitutional provisions is a reasonable rate of return upon that value."

*St. Joseph Stock Yards Co.* v. *United States, ante,* p. 38, presented the question whether an order of the Secretary of Agriculture prescribing rates for stockyards services was confiscatory. The case was submitted to the district court upon the evidence contained in the record before the Secretary. This court was called on to decide whether the district court was required to weigh the evidence. We answered affirmatively. We said (p. 51): "When the legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent the transgression of these [constitutional] limits of power. The legislature cannot preclude that scrutiny or determination by any declaration

or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. . . . It is said that we can retain judicial authority to examine the weight of evidence when the question concerns the right of personal liberty. But if this be so, it is not because we are privileged to perform our judicial duty in that case and for reasons of convenience to disregard it in others. The principle applies when rights either of person or of property are protected by constitutional restrictions. Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority."

The just compensation clause may not be evaded or impaired by any form of legislation. Against the objection of the owner of private property taken for public use, the Congress may not directly or through any legislative agency finally determine the amount that is safeguarded to him by that clause. If as to the value of his property the owner accepts legislative or administrative determinations or challenges them merely upon the ground that they were not made in accordance with statutes governing a subordinate agency, no constitutional question arises. But, when he appropriately invokes the just compensation clause, he is entitled to a judicial determination of the amount. The due process clause assures a full hearing before the court or other tribunal empowered to perform the judicial function

involved. That includes the right to introduce evidence [28] and have judicial findings based upon it.[29]

5. Although not suggested by appellees, it is here urged that the lower court was without power to consider the question whether the order is confiscatory. Grounds taken are that appellants did not seasonably raise that issue or present their evidence upon it to the commission, and that in respect of divisions, as distinguished from the joint rates to be divided, confiscation can never be the ultimate issue.

But neither group of carriers claimed before the commission or here asserts that the joint rates are not sufficient to permit nonconfiscatory divisions that are just, reasonable and equitable within the meaning of § 15 (6). By failure to suggest the contrary, they virtually concede them adequate for all purposes. The order prohibits the application of any other divisions and, unless enjoined, must be given effect according to its terms. It directs adjustment on the prescribed basis on shipments made after November 22, 1930. 144 I. C. C. 603. If that part of the order is carried into effect, the amounts to be paid under it by the northern lines to the southern lines will exceed, as asserted by appellants, $1,200,000.

[28] *Prendergast* v. *N. Y. Tel. Co.*, 262 U. S. 43, 50. *Oregon R. & N. Co.* v. *Fairchild*, 224 U. S. 510, 525. Cf. *Chicago, B. & Q. R. Co.* v. *Osborne*, 265 U. S. 14.

[29] *Ohio Valley Water Co.* v. *Ben Avon Borough*, 253 U. S. 287. *Bluefield Water Works Co.* v. *Public Service Comm'n*, 262 U. S. 679, 689. *Dayton-Goose Creek Ry.* v. *United States*, 263 U. S. 456, 485–486. *Ohio Utilities Co.* v. *Utilities Commission*, 267 U. S. 359, 364. *Lehigh Valley R. Co.* v. *Utility Commissioners*, 278 U. S. 24, 36–41. *United Railways* v. *West*, 280 U. S. 234, 251. *Crowell* v. *Benson*, 285 U. S. 22, 46, 56, 60. *State Corporation Comm'n* v. *Wichita Gas Co.*, 290 U. S. 561, 569. Cf. *Tagg Bros. & Moorhead* v. *United States*, 280 U. S. 420, 443. *Phillips* v. *Commissioner*, 283 U. S. 589, 600. *American Surety Co.* v. *Baldwin*, 287 U. S. 156, 168.

And the application of the prescribed basis to future shipments will correspondingly reduce northern lines' compensation.

They could not foresee that confiscatory restitution would be required or that confiscatory divisions would be prescribed; they were not bound, in advance of the commission's findings and report, to set up a fear of transgression of their constitutional rights. Presumably the commission would keep within the law. The boundaries of the power conferred upon it by § 15 (6) had been clearly defined. Expounding that provision, we had held: "It is settled that in determining what the divisions should be, the Commission may, in the public interest, take into consideration the financial needs of a weaker road; and that it may be given a division larger than justice merely as between the parties would suggest 'in order to maintain it in effective operation as part of an adequate transportation system,' provided the share left to its connections is 'adequate to avoid a confiscatory result.' "[30] The limitation noted in that statement merely applies the principle that "there is no place in our constitutional system for the exercise of arbitrary power."[31]

Appellees do not claim that appellants were required to or could have raised the question of confiscation upon the proposed report of the examiners. That report is not a part of the record. At the trial appellants offered it in evidence. The commission objected to it on the ground that it is "a mere recommendation of an employee of the commission to the commission." The court sustained the objection. The report of the commission

---

[30] *United States* v. *Abilene & Southern Ry. Co.*, 265 U. S. 274, 284–285, citing *Dayton-Goose Creek Ry. Co.* v. *United States*, 263 U. S. 456, 477; *New England Divisions Case*, 261 U. S. 184, 194, 195.

[31] *Garfield* v. *Goldsby*, 211 U. S. 249, 262. *Jones* v. *Securities & Exchange Comm'n*, *ante*, p. 1.

does not disclose the examiners' recommendations but states that its conclusions differ somewhat from those proposed by the examiners. For the reason given in the commission's objection, upon which the court excluded what the examiners proposed to the commission, the appellants would not have been justified in raising the question of confiscation upon the proposed report.

No Act of Congress requires carriers, in advance of suit to set aside divisions or other orders, to petition the commission for rehearing, repeal or modification. Nor has Congress attempted to limit the time within which the carrier may sue to enjoin enforcement of an order of the commission prescribing rates or divisions. That is so for the reason, among others, that divisions valid when made may later become confiscatory.[32] For example, the evidence as to the cost of service introduced before the commission and at the trial was based on operations in 1929. The appellants were not given and could not obtain a hearing before the commission upon the question of confiscation. Their failure earlier to invoke constitutional protection does not bar this suit. That they diligently sought relief from the commission is shown in the latter's brief here in which, justifying or explaining its denial of the second petition for rehearing, it says: "When the Commission denied the second petition, it already had before it and had considered the proffered evidence in support of the claim of confiscation that appellants desired it to consider, as well as the entire record of the previous hearings, much of the testimony in which consisted of cost calculations and other statistical data offered by the appellants." Appellants conformed to practice appropriate and desirable as indicated

[32] *Banton* v. *Belt Line Ry.*, 268 U. S. 413, 418. *Bluefield Water Works Co.* v. *Public Service Comm'n*, 262 U. S. 679, 693. *Galveston Electric Co.* v. *Galveston*, 258 U. S. 388, 400. *Smith* v. *Illinois Bell Tel. Co.*, 282 U. S. 133, 162.

in *Manufacturers Ry. Co.* v. *United States*, 246 U. S. 457, 489, and recently expounded in *St. Joseph Stock Yards Co.* v. *United States, ante,* p. 38.

Appellants appropriately invoked judicial power to obtain constitutional protection against the commission's order. The district court rightly held them entitled to introduce evidence in addition to that contained in the record before the commission, and rightly proceeded, upon consideration of all the evidence, to make findings and, upon the basis of the facts that it found, to decide upon the constitutional question.

6. As to proof of confiscation.

By this appeal we are required to analyze findings of the commission and of the court, in so far as they bear upon the question of confiscation, and, to the extent that may be found necessary, to review the evidence and to decide whether appellants have proved, with the degree of certainty required in cases such as this, that the enforcement of the commission's order will operate to deprive them of their property without due process of law or to take its use for the service of the public without just compensation in contravention of the Fifth Amendment.[33]

The commission having refused to consider the question of confiscation, we are deprived of the benefits of its analysis of the evidence, findings of fact and inferences based upon them that necessarily would have been involved in its determination of the question whether the prescribed divisions are, and for a reasonable time in the

---

[33] *Kansas City So. Ry.* v. *Albers Commission Co.,* 223 U. S. 573, 591–594. *Cedar Rapids Gas Co.* v. *Cedar Rapids,* 223 U. S. 655, 668–669. *Oregon R. & N. Co.* v. *Fairchild,* 224 U. S. 510, 528. *Union Pacific R. Co.* v. *Public Service Comm'n,* 248 U. S. 67, 69. *Los Angeles Gas Co.* v. *Railroad Comm'n,* 289 U. S. 287, 315–316. *Norris* v. *Alabama,* 294 U. S. 587, 589–590. *United States* v. *Idaho, ante,* p. 105. *St. Joseph Stock Yards Co.* v. *United States, ante,* pp. 38, 51.

immediate future will be, sufficient to constitute just compensation, within the meaning of the Fifth Amendment, for the services covered by the divisions.

To warrant reversal in so far as the order directs adjustment and refund, it must clearly appear from the evidence before us that its enforcement, in respect of the period involved, would leave appellants less than enough to cover operating expenses, taxes and just compensation for the use of their property fairly attributable to the service covered by the divisions. To warrant reversal of the decree in other respects, the evidence must show that the prescribed divisions were and in the future will be confiscatory.

Appellees' suggestion that the challenged report and order come to this court upon concurrent findings of the commission and district court is without force. Denial without more of the second petition for rehearing involved no finding of fact. It was merely a refusal to pass upon the question of confiscation then for the first time presented. And, as the commission in prescribing divisions acted legislatively and not judicially, the rule that where two courts have reached the same conclusion on a question of fact it will be accepted here unless clearly erroneous, does not apply.

Appellants' method of calculation.—For each carrier figure system costs per car mile thus: Ascertain from its reports to the commission operating expenses and taxes; apportion total between freight and passenger according to formula prescribed by the commission; from freight expense deduct cost of car repairs, depreciation and retirements; divide remainder by total freight car miles and to the quotient add two cents per mile paid for use and maintenance of refrigerator cars used to haul citrus fruit. The result is taken to represent the cost per car mile of transportation of that freight. It depends upon the assumption that citrus fruit car mile cost is at least as high as the average of system car mile cost.

To ascertain property value apportionable to the service covered by the prescribed divisions: Divide investment in road and equipment as reported to commission on the basis of freight operating expenses—less cost of repair, depreciation. and retirement of freight cars—to total operating expenses, and take such proportion of value so assigned to freight as citrus fruit car miles. are to total freight car miles. Citrus fruit net revenues divided by value assigned to that traffic gives rate of return.

The shipping season of 1928–29 was the test period. There were hauled 17,324 carloads by the Atlantic Coast Line and Seaboard Air Line from Florida points to Richmond, Virginia; and by the Richmond, Fredericksburg & Potomac to Potomac Yards; whence the Pennsylvania hauled the larger part, and the Baltimore & Ohio the rest, to destinations. Comparison of expenses determined by application of the estimated citrus fruit car mile cost with revenues calculated on the basis of the challenged divisions follows:

|  | Revenues | Expenses | Deficit |
|---|---|---|---|
| R., F. & P. | $411,051.64 | $412,311.20 | $1,259.56 |
| Pennsylvania | 748,339.98 | 813,918.88 | 65,578.90 |
| B. & O. | 87,845.90 | 74,477.23 | *13,368.67 |

\* Surplus.

In the same season 4,662 carloads of citrus fruit from Florida were hauled by southern carriers to other gateways named in the order and by northern lines thence to destinations in central territory. Calculations on the same basis indicate revenues $285,064.02, estimated expenses $232,456.87, surplus $52,607.15. Appellants say of this surplus $39,644.92 is accounted for by 1,253 cars, hauled a short distance by northern carriers, affected by minimum provisions of the order, and that the cost assigned to them is understated.

Comparisons of divisions.—Divisions of revenues from 29,221 cars hauled to destination in Trunk Line and New

England Territory, as settled, amounted to about $285,000 less than if made on mileage prorate. Divisions on basis prescribed by the order would have been about $600,000 less than if made on mileage prorate. The prescribed divisions on shipments to New York and Philadelphia are more than 94 per cent. of local rates from the south to Richmond and are less than 35 per cent. of local rates north from Richmond. Southern weighted average hauls calculated on short line distances were 810 miles and the northern 358 miles. Contrary to the established general rule, the order prescribes higher divisions per mile for the longer than for the shorter haul. The average earning per loaded car mile south was 31.4¢ and north 21¢.

Appellants claim that the cost per citrus fruit car mile is greater than the average of all. To support that contention they emphasize evidence introduced to support these facts: Refrigerator cars used are very much heavier than the cars used to haul dead freight; additional inspection service is required, hauling over road and handling in terminals is more expeditious than that given to ordinary cars. There are required at destination relatively very expensive produce terminals. Diversions and reconsignments are more frequent. Expedited service requires, at intermediate and final terminals, more employees for inspection, repairing, and keeping records than otherwise would be necessary, extra engines and crews are required promptly to classify, to switch to ice houses, to effect reconsignments, to make up trains and to haul them. The relatively high percentage of empty car movement makes it hard to balance movement in both directions and frequently requires operation of locomotives over the road without cars.

Appellants cite a statement in the report of the commission to the effect that in general the evidence indicates that citrus fruit like other perishable traffic is

given a specialized,. expedited service which is undoubt-
edly more expensive than the ordinary run of freight.
They refer to the testimony of experts, who expressed
opinion to the effect that the cost of transporting citrus
fruit was greater than the average cost of handling all
freight, to evidence tending to show that physical condi-
tions, such as bridges, grades, tunnels, complex terminals,
affecting operating conditions on those portions of north-
ern lines used for the transportation of relatively large
amounts of citrus fruit, are more adverse than on their
respective systems as a whole.

They draw comparisons indicating 10.56 cents to be
the Baltimore & Ohio system average cost per car mile
as against 14.61 cents on the operating division over part
of which most of its citrus fruit is hauled; correspond-
ingly 10.95 cents appears to be the Pennsylvania system
average as against 11.59 cents for its Eastern Region and
New York Zone over a part of which most of its citrus
fruit is hauled.[34]  Basing the statement on mere opinion
of an expert, they say that on hauls over the Pennsyl-
vania line through Baltimore and Philadelphia to New
York the transportation expense alone was 14.2 cents per
car mile.

They claim that tested by the car mile study the pre-
scribed divisions failed by substantial margins to afford
any return to the Richmond, Fredericksburg & Potomac
or to the Pennsylvania, and that they afforded a return
to the Baltimore & Ohio of only 4.42 per cent.

Appellants maintain that the principles underlying
their estimates of cost are sound and that the assumptions

[34] The Baltimore Division of the Baltimore & Ohio extends from
Brunswick, Md. through Washington, D. C., and Baltimore to Park
Junction (Philadelphia).

The combined Eastern Region and New York Zone (P. R. R. por-
tion) of the Pennsylvania embraces system lines east of Altoona, Pa.,
and Renovo, Pa., except the Long Island Railroad.

made are reasonable. Conceding that they have not proved what the exact cost per car mile chargeable to citrus fruit was in the test period, or has been since, or what it will be in the future, they refer to decisions of the commission [35] and of this court [36] recognizing the impossibility of making exact proof of cost of transportation of any commodity and indicating that sometimes resort must be had to system average costs. They emphasize the fact that railway cost accounting cannot with exactness apportion to one commodity its fair proportion of cost incurred in common with transportation of other freight or of passengers; insist that special cost studies in this case would have been impracticable; urge that they should not be held to impracticable exactness, and that reasonable determinations are sufficient. [37]

Appellees call attention to the commission's rejection of the average unit costs as a method of approximating cost of handling a single commodity. [38] They seek to discredit appellants' method by showing it would prove confiscatory the divisions that for a long time they had accepted. Their evidence tends to show: Much of the operating expenses chargeable to maintenance of way, maintenance of equipment and transportation is not affected by volume of traffic, and therefore the greater the

---

[35] Citing Sloss-Sheffield Steel & Iron Co. v. L. & N. R. Co., 30 I. C. C. 597, 602. Sugar from Key West, 112 I. C. C. 347, 348. Georgia Public Service Comm'n v. Atlantic Coast Line R. Co., 186 I. C. C. 157, 187.

[36] Citing Atlantic Coast Line v. Florida, 203 U. S. 256, 260. Wood v. Vandalia R. Co., 231 U. S. 1, 6, 7.

[37] Florida v. United States, 292 U. S. 1, 9.

[38] Citing Iron Ore Rate Cases, 41 I. C. C. 181, 281. California Growers' & Shippers' Protective League v. S. P. Co., 129 I. C. C. 25, 52. Georgia Public Service Comm'n v. Atlantic Coast Line R. Co., 186 I. C. C. 157, 183. R. W. Burch, Inc. v. Railway Express Agency, 190 I. C. C. 520, 535; 197 I. C. C. 85.

number of units of service the less the cost per unit; the very large volume of citrus fruit hauled by the Pennsylvania from Potomac Yards makes for low cost per car mile. Terminal services are not affected by length of haul. The Pennsylvania citrus fruit average haul, loaded and empty, being much greater than the system average haul, apportionment on a car mile basis makes for excessive assignment of terminal operating expenses to citrus fruit. And they rightly say that opinions of experts unsupported by adequate actual tests may not safely be substituted for concrete data.[39]

The burden on appellants, heavy though it is, does not require them to prove with arithmetical accuracy the cost of the transportation covered by the challenged divisions or the value of the property used to perform it, or the proportion attributable to that service. It is enough, if the evidence preponderating in their favor reasonably warrants findings sufficient to support the decree sought. Many issues as to which demonstrable accuracy is impossible have to be decided by the courts. In ascertaining cost of transportation of one out of many commodities hauled by railroads it is impossible to attain precision. Mere lack of it is not ground for objection either to the evidence offered or the facts which it tends to prove.[40]

We may say at once that no substantial weight is to be given to appellants' comparison of divisions prescribed for northern carriers with those given the southern lines. As shown above, the commission acting under § 15 (6) was dealing merely with fairness of divisions of a joint

---

[39] *Northern Pacific Ry.* v. *North Dakota,* 216 U. S. 579, 580. *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, 18. *Minnesota Rate Cases,* 230 U. S. 352, 466. *Missouri Rate Cases,* 230 U. S. 474, 507. Cf. *Pacific Gas Co.* v. *San Francisco,* 265 U. S. 403, 406. *McCardle* v. *Indianapolis Co.,* 272 U. S. 400, 416.

[40] *Chicago, M. & St. P. Ry. Co.* v. *Tompkins,* 176 U. S. 167, 178.

rate and not with just compensation within the meaning of the Fifth Amendment.

The commission's statement to the effect that citrus fruit transportation service "is undoubtedly more expensive than the ordinary run of freight" is not entitled to any weight, for it does not appear that the statement referred to cost per car mile. For aught that appears, some other unit may have been meant. And, as they lack disclosed definite bases of established fact, no weight may be given to cited opinions of appellants' expert witnesses to the effect that citrus fruit car mile cost is higher than system average.

Nor is there any force in appellees' suggestion to the effect that the evidence on which appellants seek to prove the prescribed divisions confiscatory would similarly condemn divisions that they accepted for a long time prior to the reduction of the joint rates November 9, 1928. As shown above, carriers advantageously to themselves and the public may and sometimes do apply rates and divisions that are lower than they could be compelled by law, to accept.

The test period 1928–29 ended more than: one year before the first complaint to the commission, four years before its final decision and the commencement of this suit, five years before entry of the decree appealed from, and six years before submission to this court. In that period there intervened a profound business depression out of which there has been some progress.[41] The evidence fails to show that the relation of citrus fruit car mile cost to the system average has remained the same as appellants claim it was in the test period. Appellants should have brought forward evidence and estimates based on operations subsequent to the complaint, No-

---

[41] Atchison, T. & S. F. Ry. Co. v. United States, 284 U. S. 248, 260, 261. Los Angeles Gas Co. v. Railroad Comm'n, 289 U. S. 287, 311. Great Northern R. Co. v. Weeks, 297 U. S. 135.

vember 22, 1930, and also as near as possible to the time of trial in the district court. The order prescribing the challenged division has been in effect for a long time, and in the absence of proof clearly showing that on the basis of present and prospective conditions it is confiscatory, its enforcement ought not to be enjoined.

Appellants' evidence was addressed primarily to the question whether as to citrus fruit traffic moving through the Richmond gateway the prescribed divisions were confiscatory. In determining whether as to any carrier that evidence was sufficient, appellants' estimated citrus fruit car mile cost is of prime importance. A slight variation in that figure is sufficient to change the balance from one side of the account to the other; to change surplus revenue to deficit. If since the order took effect that cost has been, or in the immediate future will be, substantially less than the contemporaneous system car mile cost, appellants' proof is not sufficient to show confiscation. It is very difficult to attain the high degree of certainty in respect of this vital factor that is obviously necessary to make dependable proof.

Operating expenses are incurred in innumerable services few of which, if any, are the same in respect of car mile cost as is the transportation of citrus fruit here in question. There are many elements that affect system average that have no relation to citrus fruit car mile costs. It would seem that, without specific knowledge of details of operation affecting cost during representative periods, no dependable opinion could be reached as to the cost relationship on which the appellants' case depends.

The facts that they brought forward to show that citrus fruit car mile cost is at least as high as the system average undoubtedly tend in a general way to aid that contention. But they lack useful certainty. Appellees' criticisms above referred to are substantial and at least sufficient reasonably to warn against acceptance of ap-

pellants' claim. A very small part of the Pennsylvania system mileage is used to haul substantial quantities of Florida citrus fruit. The principal volume moves over the lines north from Potomac Yards. Ordinarily, density of such traffic would make for lower car mile cost. Appellants claim that there it is relatively high, but the evidence fails adequately to support that contention. Appellants' failure to introduce evidence based on observations or tests made contemporaneously with transportation, in representative periods subsequent to the taking effect of the order and near to the time of trial, strongly suggests that the figures on which appellants' calculations are based could not be supported and leaves in grave doubt the validity of their proof.

We conclude that the evidence is not sufficient to establish with requisite certainty what has been or will be the cost of the service covered by the prescribed divisions and that the district court rightly dismissed the suit.

*Affirmed.*

MR. JUSTICE BRANDEIS, concurring.

I agree that the suit is without merit and that the District Court was right in dismissing the bill. Two objections to the order of the Commission, unsubstantial but otherwise proper subjects for judicial review, were disposed of briefly below and have rightly received like treatment here. It is the third objection—the claim of "confiscation" to which the attention of both courts has been directed. That claim imposed upon the lower court six days of hearings. It imposed upon this Court a reargument and a huge record. With the briefs, it weighs avoirdupois 67 pounds. The narrative statement of the testimony occupies 1237 pages of the printed record in this Court; the briefs fill 546 pages. There are, besides, 428 exhibits. In my opinion, the applicable rules of procedure forbade the lower court from passing upon the

question of "confiscation" in this suit. If "confiscation" is threatened, there is ample remedy; but the redress must be sought in a different proceeding.

*First.* The question on which I differ from the Court is this: Where, in a suit to set aside a divisions-order, under the Urgent Deficiency Act of October 22, 1913, c. 32, 38 Stat. 208, 216, the court concludes that there was, in entering the order, no error of law or of fact and no irregularity of procedure or abuse of discretion, may it proceed to enquire into a charge, not seasonably made before the Commission, that the divisions-order would result in "confiscation" when applied to the through rates prescribed by a rate-order then in force, which rate-order had been acquiesced in by all participating carriers and was not then under review? In my opinion, the answer should be "No." For, if the charged "confiscation" is due to the alleged inadequacy of the prescribed through rates, the appropriate remedy is to apply to the Commission to revise the rate-order. If the charged "confiscation" is due to alleged failure of the Commission to allot to the complaining carriers their fair share of an adequate through rate, they are barred from complaining in this suit, because they failed seasonably to raise, before the Commission, that issue and present there the evidence in support thereof. They could of course apply to the Commission to modify the order so as to make it just for the future.

While the Commission may, at any time, modify or supersede an order, no court has power to set an order aside except for inherent error or procedural irregularity. To hold that this divisions-order may be set aside because "confiscation" will result if it is applied in connection with the rate-order not under review, and not objected to, would make of that claim a paramount and prerogative right hitherto unknown to the law.

*Second.* The treatment of the suit as a "confiscation case" has led to serious misconceptions. The term "con-

fiscation" is appropriately used only in a proceeding for the fixing of rates, where the objection is made that the Commission, in prescribing rates, made them so low that they are not compensatory; and that the Government is thereby taking private property for the public without paying compensation. The order under review is not a rate-order. It is an order under § 15 (6) of the Interstate Commerce Act which fixes, as between the carriers participating in existing through rates, "just, reasonable, and equitable divisions," but leaves the through rate undisturbed. Ordinarily, divisions of through rates are governed by agreement between the carriers. It is only where they fail to agree that an application is made under that section.

In a proceeding to fix "just, reasonable, and equitable divisions," "confiscation" can never be an ultimate issue. For, as a matter of substantive law, the fact that the share allotted to one is not compensatory is without legal significance. The Commission's task is solely to make a fair division of existing rates. A division, although fair, may conceivably fail to give any of the connecting carriers adequate compensation for the service rendered, because the through rate—the thing to be divided—is itself inadequate. Or conceivably, the through rate may be so generous that all participants will receive compensatory divisions, although, as between themselves, the division itself is unfair. The fact that the share assigned to one is non-compensatory will be of evidential value if accompanied by evidence that some other carrier is receiving better treatment. But, unless it appears that some other carrier was so favored, the non-compensatory character of the division would be entirely immaterial. And even when relevant, may be of little or no weight because of other considerations.

At best, the non-compensatory character of the share, if proved, would be only one of the many subsidiary

evidential facts which Congress, by § 15 (6), has commanded the Commission to take into consideration in determining what a fair division is. These are "among other things":

"the efficiency with which the carriers concerned are operated, the amount of revenue required to pay their respective operating expenses, taxes, and a fair return on their railway property held for and used in the service of transportation, and the importance to the public of the transportation services of such carriers; and also whether any particular participating carrier is an originating, intermediate, or delivering line, and any other fact or circumstance which would ordinarily, without regard to the mileage haul, entitle one carrier to a greater or less proportion than another carrier of the joint rate, fare or charge."

Thus, a division may be "just, reasonable and equitable," although it allots to one carrier a non-compensatory share and to another carrier a compensatory share, because it was inefficiency in operation by the former which rendered its share non-compensatory. Or, the seemingly preferential treatment of the latter might be justified by the fact that it was the originating carrier, and hence entitled by established transportation practice to the larger share of the through rate.

If inadequacy of a prescribed through rate is the reason why the share of one of the participating carriers is non-compensatory it has ample remedies under the Interstate Commerce Act and the Constitution. It may, at any time, apply to the Commission for an increase of the through rate; and if the increase is improperly denied, a remedy is available in the courts by a "confiscation" suit. That remedy would be open although the prescribed rate had been acquiesced in; for every rate order is subject to revision at any time upon application to the Commission. A divisions-order, likewise, is always subject to revision;

but change in the through rate would not necessarily render the existing divisions unfair.

*Third.* The through rates which the Commission was requested to divide in the proceeding under review are those on citrus fruit from Florida to points north of the Potomac and Ohio Rivers. These had been prescribed by order entered July 10, 1928, Railroad Commissioners of Florida *v.* Aberdeen & Rockfish R. Co., 144 I. C. C. 603; and the level of rates thereby prescribed was acquiesced in. That order did not deal with divisions. The divisions governing the Florida citrus fruit traffic had, for many years prior to July 10, 1928, been fixed by agreement. After entry of that order (which reduced the through rates on the average about 67 cents a ton), there developed a controversy as to the divisions. Being unable to agree, all the carriers—the southern lines by original complaint, the northern lines by cross-complaint—applied to the Commission, under § 15 (6) of the Interstate Commerce Act, and asked it to fix the "just, reasonable, and equitable divisions." By order entered July 3, 1933, the Commission did so, Atlantic Coast Line R. Co. *v.* Arcade & Attica R. Co., 194 I. C. C. 729. It is that divisions-order which it is sought to have set aside with a view to having the share of the northern carriers increased at the expense of the southern. Two alleged errors of law charged to the Commission were quickly disposed of by the Court as being unsubstantial. Did it commit any error of law or of fact; or was it guilty of an abuse of discretion in respect to the claim of "confiscation"?

The proceedings which resulted in the entry of the divisions order, and the efforts to have it set aside, were as follows:

(a) The southern lines filed their complaint with the Commission on November 22, 1930. The cross-complaint

of the northern lines followed on April 20, 1931. Hearings began on May 11, 1931, and continued for more than seven months. Briefs were filed before the examiners. When their proposed report was submitted to the parties, both sides filed exceptions. In the proceedings before the examiners there was no claim by the northern lines that the divisions sought by the southern lines would be confiscatory. The examiners' proposed report did not mention that subject; and there was no claim made that divisions recommended by them would be confiscatory. The case was argued orally before the full Commission on the exceptions to the examiners' report, and extensive briefs were submitted. There was no claim or suggestion before the Commission that the division sought or proposed would be confiscatory. On July 3, 1933, the Commission entered the order for the divisions which it found to be "just, reasonable, and equitable." There was no reference to the subject of confiscation in the accompanying report which occupies 34 pages. Atlantic Coast Line R. Co. *v.* Arcade & Attica R. Co., 194 I. C. C. 729–762.

(b) The northern lines presented a petition requesting that the hearing be reopened for reconsideration on the evidence already introduced and supplemental data culled from statistical reports in the Commission's files, which it was agreed should be treated as evidence. On October 9, 1933, the proceedings were reopened as requested to reconsider, upon the evidence originally submitted and that then added, whether there had been an error of judgment in fixing the divisions. There was no claim made in this petition for a rehearing that the divisions which had been prescribed by the order of July 3, 1933, were confiscatory. The Commission discussed in a supplemental report of 13 pages the errors assigned; concluded that the objections were unfounded; and on January 8, 1934, affirmed the divisions prescribed. There was no reference in the supplemental report to the subject of confiscation. 198 I. C. C. 375–387.

(c) On April 27, 1934, the northern carriers presented a second petition for a rehearing; and with it presented, as additional evidence, "cost studies." There was no suggestion that these were, in a legal sense, newly discovered evidence; nor was there a contention that they were evidence of a change in economic or traffic conditions which required that the Commission's conclusion should be changed. The main claim was, as in the first petition for rehearing, that the Commission erred in its judgment. But the second petition contained a claim that the divisions awarded to the northern lines were confiscatory. On May 14, 1934, this second petition was denied without opinion.

(d) On May 25, 1934, the northern carriers brought this suit in the federal court for Eastern Virginia to set aside the order of July 3, 1933. The bill sought relief on five grounds. Prominent among them was the claim that this division was confiscatory. At the hearing before the three judges, which began on September 17, 1934, and occupied six days, the plaintiffs introduced in evidence a transcript of the evidence before the Commission on which the order complained of had been entered and confirmed, consisting of 2,054 pages of oral testimony and 358 exhibits. Over objections of the defendants the plaintiffs were permitted to introduce additional oral evidence, of which the transcript fills 1,066 pages; also, 70 exhibits. On December 31, 1934, the court entered a final decree dismissing the bill. Its unanimous opinion disposes briefly of the objections other than confiscation. To that subject nearly all of the 18-page opinion is devoted. 9 F. Supp. 181–199.

(e) The application for appeal to this Court was filed February 26, 1935. Of the grounds for relief set forth in the bill, only three were insisted on at the original argument, namely: (1) That the Commission subordinated all matters which under § 15 (6) it was required to take

into consideration to the single element of the southern lines' supposed financial needs. (2) That, while purporting to give "due consideration" to a "fair return" on the railway property of the southern lines, the Commission "considered only the rates of return of said Southern lines from the *entire operations* of such lines instead of a fair return on Southern lines' property *fairly attributable to the service of transporting citrus fruit*"; (3) That the divisions allowed are confiscatory. On the reargument, confiscation was the only subject discussed; and the opinion of the Court deals mainly with it.

*Fourth.* Clearly, the Commission did not err either in a ruling of law or a finding of fact as to "confiscation";—since it made no ruling or finding on that subject. Was it guilty of an abuse of discretion in refusing to pass upon it? Congress conferred upon the Commission power to grant or deny, in its discretion, a petition for rehearing of a decision. Interstate Commerce Act, § 16a. It may be granted after entry of an order or before; and the case may be reopened to admit additional evidence. The "cost studies" submitted with the second petition for rehearing were not, in a legal sense, newly discovered evidence. There was a belated offering of evidence in support of a belated contention. The purpose was to introduce, at that late day, more evidence bearing upon the question of what would be fair.

The refusal to grant the second petition for a rehearing was not an abuse of discretion. Federal appellate courts will not in civil cases, upon review of the judgment of the trial court, consider any objection not seasonably presented below; and an objection first presented in a petition for rehearing which has been denied is not seasonably presented unless in connection with the denial that objection was specifically passed upon. This rule is of general application. It governs the appellate court's action whether the objection raises a constitutional ques-

tion, or relates to a matter of lesser dignity. No reason has been suggested why that rule should not apply equally to a judicial review by the district courts, and this Court, of the action of the Commission. And no case has been found in which the applicability of the rule to a case like the present has been questioned.

The case at bar is not like *Atchison, T. & S. F. Ry.* v. *United States,* 284 U., S. 248, where the order was set aside because the Commission refused to reopen the case and hear additional evidence. That offered was of changed conditions; important, because every rate-order is subject to revision upon changes in conditions, and the change which had occurred since the hearings was catastrophic. To refuse to reopen the hearing under those circumstances was held to be an abuse of discretion. In the case at bar no controlling change of condition was alleged. There was not even a claim of newly discovered evidence. The *Atchison* case rests upon its exceptional facts. It is apparently the only instance in which this Court has interfered with the exercise of the Commission's discretion in granting, or refusing, to reopen a hearing. Compare *United States* v. *Northern Pacific Ry.,* 288 U. S. 490, 492 *et seq.; Illinois Comm'n* v. *United States,* 292 U. S. 474, 480–481; *St. Joseph Stock Yards Co.* v. *United States, ante,* p. 38.

*Fifth.* Thus, the divisions-order is free of inherent error. Paragraph 4 of § 1 imposes upon the Commission the duty of establishing "just, reasonable and equitable divisions" [of through rates] "which shall not unduly prefer or prejudice any of such participating carriers." As the Court says, the purpose of Congress is "to empower and require the Commission to make divisions that colloquially may be said to be fair." It adds:

"When made in accordance with the Act, the commission's orders prescribing divisions are the equivalent of Acts of Congress requiring the carriers to serve for the amounts

specified. Taken, as they must be, in connection with the duties to the public imposed by law upon the carriers, they command service and for that purpose expropriate the use of carriers' property. If when made the prescribed divisions are or later shall become less than just compensation, the carriers may not be required to serve therefor. And, if after appropriate effort they fail to obtain divisions that do constitute just compensation for their services including the use of their properties, the carriers may by suit in equity have the order prescribing, or requiring to be kept in force, the challenged divisions adjudged void and its enforcement permanently enjoined."

That additional statement is, in my opinion, without support in any act of Congress. No law gives to a divisions-order any greater, or other, effect than that expressed in its words. The divisions-order, which alone is here under review, contains no command that the "carriers serve for the amounts specified." Nor does it "command service" at all. It merely directs

"that said complainants, cross-complainants, defendants and respondents, according as they participate in the transportation be, and they are hereby notified and required to cease and desist, on and after November 1, 1933, and thereafter to abstain from asking, demanding, collecting or receiving, divisions of said joint rates upon other bases than those prescribed."

The only command to serve is contained in the rate-order not here under review.

The Court states further: "Prescribing of divisions is a legislative function." It would be more accurate to say that the task imposed by § 15 (6) is a judicial, or quasi-judicial function, incident to the legislative process of rate-regulation. Despite the doctrine of the separation of powers, the Commission, like other governmental bodies, exercises certain administrative and judicial, as well as legislative functions. Many of its administrative or judicial orders may affect the earnings and net-income

of the carriers, and thus affect indirectly the adequacy of existing rates; but they are, in no sense, rate-orders.

Prominent among determinations judicial in their nature are those under § 3, whether allowances made to one shipper for the use of his facilities, or for services, are, as between him and competing shippers, fair, or whether they constitute preferential treatment; determinations under Paragraph 15 of § 1, of the fair amount payable by one carrier to another for the use of terminals or equipment or for services rendered; determinations under Paragraph 12 of § 1, whether distribution made of coal cars among shippers is just and reasonable; determinations under the Valuation Act of March 1, 1913, c. 92, 37 Stat. 701, of the fair value of railroad properties. Among the administrative functions is that of determining under the Safety Appliance and Boiler Inspection Acts what changes in equipment are required in order to insure safety; under Paragraphs 4 and 9 of § 1, what additional facilities and equipment are required to ensure adequate transportation service; under Paragraphs 2 to 10 of § 20a, whether a carrier should be permitted to issue securities or assume financial obligations, and if so, on what terms; under Paragraphs 18 to 22 of § 1, whether a carrier should be permitted to construct, acquire or control an additional line, or to abandon the whole, or any part of, one existing.

In such judicial or administrative determinations it might conceivably be contended that expenditures ordered would so reduce net-earnings as to render non-compensatory some existing prescribed rates. But the contention would not convert the proceeding into a rate-case. If the claim that by reason of the expenditure ordered, prescribed rates would cease to be compensatory proved to be well-founded, the appropriate remedy would be to seek a modification of the rate-order which had thus become confiscatory, not to set aside the ad-

ministrative or judicial order which inherently was, and remained, free of error.

*Sixth.* The question discussed is not one of merely procedural importance. To permit enquiry into the question of confiscation under the procedure here pursued might affect seriously the substantive rights of other participating carriers. As the divisions-order merely allots the share of each in existing rates, any addition to the share given to one must necessarily be taken from the share of others. For aught that appears, the share of the southern carriers received, or insisted upon, is no more than a compensatory return. If the Court had in this case concluded that the share allotted to the northern carriers was non-compensatory, and pursuant to its action their share were increased, the result might be to make the share of the southern carriers non-compensatory.

In passing upon the issue of confiscation the Court discussed the question, whether the trial court properly admitted evidence which had not been introduced before the Commission; and decided that the evidence was admissible. I do not agree with the Court's conclusion on that subject. But as the issue of "confiscation" was, in my opinion, not properly before the trial court, I refrain from discussing the question what evidence would have been admissible if that issue had been. See *Crowell* v. *Benson,* 285 U. S. 22 and *St. Joseph Stock Yards Co.* v. *United States, supra.*

Mr. Justice Stone, Mr. Justice Roberts and Mr. Justice Cardozo join in this opinion.